**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1280**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PETER HOROWITZ; SUSAN HOROWITZ,

Defendants - Appellants.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:16-cv-01997-PWG)

Submitted:  September 11, 2020                                     Decided:  October 20, 2020

Before WILKINSON, NIEMEYER, and DIAZ, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Diaz joined.

James N. Mastracchio, Daniel G. Strickland, Washington, D.C., Stacey M. Mohr, EVERSHEDS SUTHERLAND (US) LLP, Atlanta, Georgia, for Appellants.  Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Travis A. Greaves, Deputy Assistant Attorney General, Gilbert S. Rothenberg, Francesca Ugolini, Douglas C. Rennie, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

NIEMEYER, Circuit Judge:

To help combat tax evasion, the Bank Secrecy Act of 1970 requires that U.S. citizens who have foreign bank accounts report the accounts to the government on an annual basis by filing a Report of Foreign Bank and Financial Accounts, commonly referred to as an FBAR. *See* 31 U.S.C. § 5314(a); 31 C.F.R. § 1010.350(a). Any person who fails to file an FBAR is subject to a maximum civil penalty of not more than $10,000 or, if the person's failure to file was "willful," to a maximum civil penalty of the greater of $100,000 or 50% of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5).

Peter and Susan Horowitz, U.S. citizens and a married couple, failed to file FBARs as required for the years 1988 through 2008 for accounts that they owned in Swiss banks. The Horowitzes maintain that they had no knowledge of the requirement to file an FBAR until late 2009.

The government, however, determined that the Horowitzes' failure to file FBARs was "willful," as that term is used in the Act, and, on June 13, 2014, it assessed enhanced penalties of $247,030 against each spouse for both 2007 and 2008. When the Horowitzes refused to pay the assessed penalties, the government commenced this action in June 2016 to collect the penalties, along with interest and additional penalties for late payment.

On the parties' cross-motions for summary judgment filed after the completion of discovery, the district court entered judgment in favor of the government against Peter Horowitz for the assessed penalty of $494,060, plus $160,508 in interest and additional penalties that accrued after the assessment, for a total of $654,568; and against Susan

2

Horowitz, for the assessed penalty of $247,030 for the calendar year 2007, plus $80,254 in interest and additional penalties, for a total of $327,284. The court, however, entered judgment in favor of Susan for the calendar year 2008, concluding that she did not have an ownership interest in the relevant Swiss account during that year. The court concluded that even if the Horowitzes lacked actual knowledge of the FBAR reporting requirement, as they claimed, the "undisputed facts [established] that [they] recklessly disregarded the . . . requirement" and that such recklessness "suffice[d] for a finding of willfulness."

For the reasons given herein, we affirm.

I

Peter and Susan Horowitz are highly educated professionals. Peter is a doctor who has spent his career working as an anesthesiologist, while Susan received a Ph.D. in clinical social work and worked as a public health analyst at the U.S. Department of Health and Human Services.

In 1984, the Horowitzes moved to Riyadh, Saudi Arabia, to enable Peter to take a job working at the King Feisal Hospital for an annual salary of $120,000. Susan found a job in Saudi Arabia after they arrived there. The Horowitzes used Susan's wages for the family's living expenses, while saving most of Peter's salary and depositing the money into an account with a Saudi Arabian bank that had a branch at the hospital. The Horowitzes correctly understood that they were required to pay U.S. income taxes on the money that they earned in Saudi Arabia, and they did so each year with the help of an accountant in the United States who prepared their returns.

3

After the Horowitzes had been living in Saudi Arabia for over three years, a banker from the Foreign Commerce Bank ("FOCO"), a Swiss bank, contacted Peter about the possibility of opening an account with the bank. Peter decided to do so because "the money that was in the Saudi bank was not earning any interest because Saudi banks don't do that. It's a religious thing." Also, Peter was concerned that he and Susan might have trouble accessing his Saudi account should they suddenly be deported by the Saudi government. He concluded that opening a Swiss bank account would provide more safety and security for their savings.

Even though the money in their FOCO account earned interest, the Horowitzes did not disclose the Swiss account to their accountant and did not pay taxes on the income. They explained that, after talking to their friends in Saudi Arabia, their understanding was that they did not have to pay U.S. taxes on the money earned from the Swiss account.

When the Horowitzes learned in 1994 that FOCO was being acquired by an Italian bank, they decided to move their funds from the FOCO account into an account with Union Bank of Switzerland ("UBS"). The Horowitzes set up their account with UBS as a joint account and listed their address in Saudi Arabia. The UBS account also earned interest, but again the Horowitzes neither disclosed the account nor paid taxes on the income from it.

In 2001, the Horowitzes moved back to the United States, but they decided to maintain their UBS account, which had grown to approximately $1.6 million and amounted to one of their largest assets. Peter testified that they felt like the Swiss banking system was safe and secure and, therefore, saw no reason to transfer the money to the United

4

States.  Susan thought of their UBS account as a "nest-egg retirement account."  Prior to their move back to the United States, the Horowitzes told a UBS representative that they were returning to the United States, but they could not provide the representative with a new address because they did not yet know where they would live.  After they had settled in the United States, however, they still never provided UBS with their address and thus did not receive statements from UBS by mail after 2001.  Instead, Peter monitored the account on the couple's behalf by calling the bank every year or two.

Beginning in 2008, Peter began reading troubling news articles concerning UBS, which he shared with Susan.  According to Peter, the articles "describe[d] how UBS was in big trouble because of their involvement in the . . . worldwide housing bubble" and how the bank was receiving a $50 billion bailout from the Swiss government.  Wanting to make sure that the bank's financial troubles were not going to impact their account, Peter called a UBS representative in July 2008.  The representative told Peter that the bank intended to close the accounts of all Americans by the end of the year.  When Peter asked why UBS would do such a thing, the representative said "something about it being bank policy."  This phone call prompted Peter to travel to Switzerland in October 2008, close the UBS account, and transfer the couple's nearly $2-million balance to an account he opened with Finter Bank Zürich, another Swiss bank.  Peter had brought Susan's passport with him on that trip with the intent of designating her as a joint owner, but Finter Bank would not do so because Susan was not present.  Accordingly, in October 2008, Peter became the sole owner of the Finter Bank account.

The Finter Bank account was set up on October 13, 2008, as a "numbered" account (such that a number, rather than a name, identified the account holder in correspondence) with "hold mail" service (meaning that, for a quarterly fee, the bank would hold all correspondence). Finter Bank later explained that "[t]hese services allowed U.S. clients to eliminate the paper trail associated with the undeclared assets and income they held at Finter in Switzerland." Peter testified later, however, that he was "not try[ing] to 'eliminate a paper trail' [or] 'hide [his] account from U.S. authorities'" when he maintained the Finter Bank account.

To open that account, Peter was required to sign an agreement with Finter Bank, which established the terms of the relationship and allowed him to make numerous elections with regard to the account. The agreement form included boxes to check for the elections and other items of information. And the signed agreement shows that boxes were checked to make the account a numbered account; to maintain the account in U.S. dollars; to authorize the bank to invest with foreign banks; to hold mail about the account; and to correspond in English, among other things. Peter initialed each page of the agreement and signed it on the last page. One checked box identified the currency of Peter's funds and had a blank next to it that was filled in by hand with "USD." While Peter testified, "I don't think [that] is my check," he did acknowledge that he had written in the "USD" in the blank. When explaining why he did that when the agreement form already had a box checked that it was to be maintained in U.S. dollars, Peter stated that he wrote in "USD" because, "being obsessive-compulsive, I write in USD. And then I resume signing [each

6

page], you know." But he also claimed that he did not generally read the language in the agreement as he initialed each page.

A year later, in October 2009, Peter and Susan traveled back to Switzerland to make her a joint owner of the Finter Bank account.

Shortly after the Horowitzes' October 2009 trip, Peter started reading "newspaper articles about people who were voluntarily disclosing" foreign bank accounts. He stated that as "the numbers of people [making such declarations] got larger and larger," he started to wonder if he and Susan were "among the people committing some kind of wrong." Around this time, Peter also received a letter in the mail from UBS, dated November 10, 2009, that stated that the IRS was "seeking information with regard to accounts of certain U.S. persons . . . that are or have been maintained with UBS" and that their "account with UBS appear[ed] to be within the scope of the IRS Treaty Request." At "[t]he very end of November 2009," Peter and Susan decided to consult a tax attorney, and they did so in December 2009. Both testified that when they met with the tax attorney, they learned for the first time of the requirement to report foreign bank accounts.

In January 2010, the Horowitzes submitted a letter to the IRS disclosing the FOCO, UBS, and Finter Bank accounts and requesting that they be accepted into the Department of Treasury's Offshore Voluntary Disclosure Program. This program provided potential protection from criminal prosecution and reduced penalties in exchange for cooperation. After entering the program, the Horowitzes filed FBARs, as well as amended income tax returns, for 2003 through 2008. As part of that process, they reported additional income

7

of $215,126 and paid more than $100,000 in back taxes. In 2012, however, the Horowitzes opted out of the program.

Since the late 1970s, the Horowitzes had retained an accountant to prepare their annual joint income tax returns. Each year, in advance of the tax filing deadline, Peter prepared summaries for the accountant of the family's tax information for the preceding calendar year, listing his and Susan's salaries, the interest earned in their domestic bank accounts, any dividends, and various deductible expenses. The accountant would then use those summaries to prepare the returns. After completing the returns, the accountant sent them to the Horowitzes for their review and signatures, after which the accountant filed the returns with the IRS. While the tax summaries included information about the Horowitzes' interest-bearing American bank accounts, they never listed the Horowitzes' Swiss bank accounts. Nor did the Horowitzes pay taxes on the income from those accounts until after they entered the IRS's Voluntary Disclosure Program in 2010. Moreover, Peter never asked their accountant whether interest income from the Swiss bank accounts needed to be reported. Indeed, he has confirmed that he never mentioned that he and Susan had a Swiss bank account in which they maintained a substantial portion of their savings and from which they received substantial income.

This practice for preparing and filing income tax returns was followed with respect to the Horowitzes' tax returns for calendar years 2007 and 2008. As had been the case over the years, the Horowitzes' accountant worked under the assumption that the information that Peter supplied in his summaries was the "total information needed to prepare the return properly." Accordingly, in preparing the 2007 and 2008 returns, the

8

accountant represented on the Horowitzes' tax returns that they did not have any foreign bank accounts. Specifically, both tax returns included a Schedule B, a one-page form on which taxpayers report interest and dividends. This form, in Part III (entitled "Foreign Accounts and Trusts"), asked the following question (Question 7):

(a) At any time during [the relevant year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1

(b) If "Yes," enter the name of the foreign country.

Form TD F 90-22.1, as referred to in Question 7a, was the Treasury Department's form number for the FBAR. On the Horowitzes tax returns for 2007 and 2008, Question 7a was answered "No," and the line for answering Question 7b was left blank.

As in earlier years, after the accountant prepared the tax returns for 2007 and 2008, he transmitted them to the Horowitzes, and both Peter and Susan signed "e-file" documents declaring the accuracy of the returns and authorizing the accountant to file their returns electronically. By signing that form, the Horowitzes declared, "[u]nder penalties of perjury," that they had "examined a copy of [their] electronic individual income tax return and accompanying schedules and statements" and that, "to the best of [their] knowledge and belief, it [was] true, correct, and complete." After the Horowitzes executed the tax returns, the accountant filed them with the IRS. While the Horowitzes both acknowledged that they had in fact executed the tax returns and made the declaration, Peter testified that he had been in the "mode of not reading [his] taxes" for decades and that his normal

9

practice was just to "look at the first two pages." Susan testified that she signed their joint returns without looking at them at all, choosing to trust her husband and the accountant.

In May 2014, the IRS sent letters to the Horowitzes proposing FBAR penalties for the unreported Swiss bank accounts that the Horowitzes had owned in 2007 and 2008. In the letters, the IRS proposed enhanced penalties based on its determination that the Horowitzes' failure to file the required FBARs was willful. The letters informed the Horowitzes that if they did not take any action by June 2, 2014, the IRS would proceed with assessing the penalties. When the Horowitzes did not respond by that date, the IRS assessed the proposed penalties on June 13, 2014.

Following the IRS's formal demand for payment of the penalties, the parties engaged in discussions and attempted to settle the claim but failed to reach an agreement. The government then commenced this action.

Following the close of discovery, the parties filed cross-motions for summary judgment, and the district court ruled on the motions in a memorandum opinion dated January 18, 2019. It granted the government's motion for summary judgment in part. It entered judgment against Peter as requested by the government and against Susan only for the calendar year 2007, explaining that the record reflected that Susan lacked ownership interest in the Finter Bank account during 2008 and therefore was not required to report that account that year.

In its opinion, the court rejected the Horowitzes' argument that a Treasury Department regulation capped the civil penalties for a willful violation at $100,000. The court noted that a regulation first issued in 1987 did state that the maximum civil penalty

10

for a willful violation was $100,000, tracking the language of the statutory provision governing civil penalties that was then in effect. But in 2004, the court noted, Congress amended the statute and increased the maximum civil penalty for a willful violation to the "greater of" $100,000 or 50% of the account balance at the time of the violation. Based on this history, the court concluded that the current version of the statute, rather than the 1987 regulation, established the relevant civil-penalty ceiling.

Next, the court rejected the Horowitzes' contention that they were entitled to summary judgment because the limitations period for the government's assessment of penalties had lapsed. While the Horowitzes acknowledged that the IRS timely assessed the penalties on June 13, 2014, they argued that those assessments had been reversed in October 2014 when a Treasury Department employee deleted the entry for the "penalty input date" from the relevant government database and did not reenter the date until May 2016, after the expiration of the limitations period. The court concluded, however, that the Horowitzes had failed to show that "the timely FBAR assessments were reversed or removed when [the employee] altered the data, nor ha[d] they established that [the employee who deleted the date] had the authority to reverse an assessment."

Finally, the court held that there was no genuine dispute of material fact as to the willfulness of the Horowitzes' failure to report. The court acknowledged that the couple "insist[ed] that neither of them had actual knowledge of the FBAR requirement." But, relying on *United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012), it reasoned that willfulness in the civil context "cover[ed] not only knowing violations . . . but reckless ones as well." And it concluded that the undisputed facts established "that the Horowitzes

11

recklessly disregarded the FBAR filing requirement." In particular, the court pointed to the fact that the tax returns signed by the Horowitzes "included a question of whether they had foreign accounts, followed by a cross-reference" to the FBAR filing requirement. It also found significant that, by their own account, the Horowitzes had "discussed their tax liabilities for their foreign accounts with their friends" but failed "to have the same conversation with the accountants they entrusted with their taxes for years."

From the judgment entered by the district court dated February 6, 2019, the Horowitzes filed this appeal.

## II

The Horowitzes contend first that "the district court erred [in] concluding that [their] failure to file FBARs for 2007 and 2008 was willful as a matter of law." They maintain that the court "ignored evidence that [their] FBAR violations were neither knowing nor reckless," and they assert that a reasonable factfinder could find that they "were innocently, [or] at most negligently, unaware of the FBAR reporting requirement." According to the Horowitzes, the district court reached its conclusion of willfulness simply because they signed tax returns that falsely stated that they had no foreign bank accounts. Moreover, they argue that basing a finding of willfulness merely on a false declaration in a tax return would "eviscerate the two-tiered liability scheme established by Congress" for willful and non-willful violations. At bottom, they contend that they are "entitled to a trial on the issue of whether either or both of them willfully failed to meet their obligation."

12

The government contends that "willfulness" in the civil context includes recklessness, defined as "conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known," quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007). It maintains that the district court "correctly held that the undisputed facts establish[ed] that the Horowitzes' failure to file FBARs for 2007 and 2008 was reckless and, therefore, willful." According to the government, "[t]he undisputed facts establishing recklessness . . . c[a]me straight from the Horowitzes' own deposition testimony," as they admitted (1) that they "never bothered" to ask their tax-return preparers whether they had to report the Swiss bank accounts and (2) that they signed their tax returns without reading them with any care. This conduct, the government contends, "meets the objective test for recklessness," rendering immaterial the Horowitzes' testimony as to their subjective beliefs.

In their reply brief, the Horowitzes present what appears to be a new argument — that "[u]nder the FBAR statutory scheme, a willful violation cannot be established through mere recklessness." They acknowledge that we reached a contrary conclusion in our unpublished opinion in *Williams*. But they contend, in effect, that *Williams* overlooked the Supreme Court's decision in *Ratzlaf v. United States*, 510 U.S. 135 (1994), where, in the context of a criminal prosecution under the Bank Secrecy Act, the Court held that establishing that the defendant committed a "willful violation" required proof that "the defendant acted with knowledge that his conduct was unlawful." *Id.* at 137. The Horowitzes argue that "willful" should be given the same meaning throughout the statute.

13

At the outset, it is far from clear that the Horowitzes sufficiently argued in their opening brief that recklessness is not sufficient to establish the willfulness of a civil FBAR violation to preserve the argument for consideration. *See United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (noting the "well settled rule that contentions not raised in the argument section of the opening brief are abandoned"). But even if we construe their opening brief generously as having advanced a version of that argument, we conclude that it nonetheless fails on the merits.

As the Horowitzes have noted, under the Bank Secrecy Act, a "willful violation" of the FBAR reporting requirement not only triggers enhanced civil penalties but also criminal penalties. *See* 31 U.S.C. § 5321(a)(5)(C) (providing for enhanced civil penalties); *id.* § 5322(a) (providing for criminal penalties, including a fine and up to five years' imprisonment). To prosecute an individual criminally under § 5322(a) for willfully violating the FBAR reporting requirement, the government must prove that the defendant knew that his failure to file an FBAR was unlawful. *See Ratzlaf*, 510 U.S. at 137, 141–42, 149. The question remains, however, whether a willful violation of the reporting requirement means something different when it comes to assessing enhanced *civil* penalties under § 5321.

Although "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf*, 510 U.S. at 143, it can nonetheless have different meanings depending on the statutory context. Indeed, the Supreme Court has specifically recognized on several occasions that "willfully," in particular, "is a 'word of many meanings whose construction is often dependent on the context in which it appears.'"

14

*Safeco*, 551 U.S. at 57 (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)); *see also Ratzlaf*, 510 U.S. at 141; *Spies v. United States*, 317 U.S. 492, 497 (1943). In *Safeco*, the Court explained at length that while it had "regularly read" "'willful' or 'willfully'" as "limiting liability to knowing violations" when the term appears "in a criminal statute," 551 U.S. at 57 n.9 (citing *Ratzlaf*, 510 U.S. at 137), the modifier carries a distinct, but equally well established, meaning in the civil context, *id.* at 57. Specifically, "common law usage . . . treated actions in 'reckless disregard' of the law as 'willful' violations." *Id.*; *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984) ("Although efforts have been made to distinguish [the terms 'willful,' 'wanton,' and 'reckless'], in practice such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit"), *quoted in Safeco*, 551 U.S. at 57. As a result of this "standard civil usage," the *Safeco* Court recognized that "where willfulness is a statutory condition of *civil liability*," the word is "generally taken . . . to cover *not only knowing violations of a standard, but reckless ones as well.*" 551 U.S. at 57 (emphasis added).

Moreover, in the circumstances of *Safeco*, the Court gave "willfully" two distinct meanings within a single statute (the Fair Credit Reporting Act), reading "willfully" in a civil provision to reach reckless violations even though criminal enforcement provisions paired "willfully" with "knowingly." 551 U.S. at 60 (citing 15 U.S.C. §§ 1681q, 1681r). The Court emphasized again that "in the criminal law 'willfully' typically narrows the otherwise sufficient intent . . . in contrast to its civil law usage"; "[t]he vocabulary of the

15

criminal side of [the Fair Credit Reporting Act] is consequently beside the point in construing the civil side." *Id.*

Given *Safeco*'s clear articulation of the distinct meanings that attach to the term "willfully" in the civil and criminal contexts — even within the same statute — we conclude that, for the purpose of applying § 5321(a)(5)'s civil penalty, a "willful violation" of the FBAR reporting requirement includes both knowing and reckless violations, even though more is required to sustain a criminal conviction for a willful violation of the same requirement under § 5322. We thus adhere to the interpretation of § 5321(a)(5)(C) that we articulated in our unpublished decision in *Williams*, 489 F. App'x at 658, 660, and continue to agree with the other courts of appeals that have considered the issue to date, *see Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (relying on *Safeco* and holding "that willfulness in the context of § 5321(a)(5)(C) includes recklessness"); *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018) (same).

We now turn to whether the government established the Horowitzes' recklessness, and thus willfulness, as a matter of law.

In the civil context, "recklessness" encompasses an objective standard — specifically, "[t]he civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also Safeco*, 551 U.S. at 68 (same). In this respect, civil recklessness contrasts with criminal recklessness and willful blindness, as both of those concepts incorporate a subjective standard. *See Farmer*, 511 U.S. at 836–37 (recognizing that the criminal law

16

"generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware"); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (explaining that willful blindness requires a subjective belief that "there is a high probability that a fact exists" and "deliberate actions to avoid learning of that fact"). At the same time, civil recklessness requires proof of something more than mere negligence: "It is [the] high risk of harm, objectively assessed, that is the essence of recklessness at common law." *Safeco*, 551 U.S. at 69. Thus, as the Third Circuit has held, when imposing a civil penalty for an FBAR violation, willfulness based on recklessness is established if the defendant "(1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily." *Bedrosian*, 912 F.3d at 153 (cleaned up).

With this understanding of recklessness, we affirm the district court's conclusion that the undisputed facts establish that the Horowitzes' failure to file the FBARs for 2007 and 2008 was objectively reckless.

By their own account, the Horowitzes knew that they were holding a significant portion of their savings — nearly $2 million — in a foreign bank account and earning interest income on that account. Indeed, Peter explained that the primary reason they established a Swiss bank account in the first place was because the Saudi bank did not pay interest. The Horowitzes also knew that the salary income they earned in Saudi Arabi was reportable to the IRS and that they had to pay U.S. taxes on it. In addition, they recognized that interest income was taxable income under American law, at least when earned in a domestic bank account. This was demonstrated by the fact that when Peter supplied the

17

accountant with information for the preparation of the Horowitzes' tax returns, he included interest income from domestic banks. With this compound knowledge — that interest income was taxable income and that foreign income was taxable in the United States — the Horowitzes could hardly conclude reasonably that the interest income from their Swiss accounts was not subject to taxes. At the very least, this tension should have triggered a question for their accountant. Instead, their only explanation for not disclosing foreign interest income related to some unspecified conversations they had with friends in Saudi Arabia in the late 1980s. Yet, if the question of whether they had to pay taxes on foreign interest income was significant enough to discuss with their friends, they were reckless in failing to discuss the same question with their accountant at any point over the next 20 years. An exception for foreign interest income simply made no sense in the circumstances of their knowledge. The facts remain undisputed that, for years, Peter reported interest income to his accountant from domestic banks and foreign income earned in Saudi Arabia but failed to report foreign interest income; he did not even disclose the existence of the Swiss bank accounts. Such conduct was not simple negligence.

Also, it is undisputed that the Finter Bank account was set up as a numbered account with "hold mail" service, which the bank knew "would and did assist U.S. clients in concealing assets and income from the IRS." Both services, the bank acknowledged, "allowed U.S. clients to eliminate the paper trail associated with the undeclared assets and income they held at Finter in Switzerland." While Peter denied filling in the boxes on the agreement with the bank that elected the use of a numbered account and the hold mail service, he surely became aware of their effect as he thereafter communicated with the

18

bank and received no mail from it. This conduct further evinces more than mere negligence.

Moreover, it bears noting that the Swiss bank accounts were by no means small or insignificant and thus susceptible to being overlooked by the Horowitzes. The money was the family's "nest-egg retirement account," and the family tended to that nest egg, traveling twice to Switzerland specifically to look after it.

Finally, the tax returns that the Horowitzes filed with the IRS asked whether they had a foreign bank account, and on each occasion the return was prepared with the answer, "No." While the accountant included that information on the returns based on Peter's summaries, the Horowitzes were sent the returns — each denying any foreign accounts — to review and sign. And they signed them knowing that they were representing to the IRS, *under the penalties of perjury*, that the returns were accurate. That they repeatedly failed to review the returns with the care sufficient at least to discover their misrepresentation of foreign bank accounts, while nonetheless stating that the returns were accurate, was again an aspect of their recklessness. And such recklessness was only heightened by the fact that they understood that the tax returns represented only the information that they had provided to the accountant.

Taking all of these circumstances together, the record indisputably establishes not only that the Horowitzes "clearly ought to have known" that they were failing to satisfy their obligation to disclose their Swiss accounts, but also that they were in a "position to find out for certain very easily." *Bedrosian*, 912 F.3d at 153 (cleaned up). Despite numerous red flags, they neither made a simple inquiry to their accountant nor gave even

19

the minimal effort necessary to render meaningful their sworn declaration that their tax returns were accurate. We therefore affirm the district court's conclusion that the undisputed facts establish that "the Horowitzes recklessly disregarded the FBAR filing requirement" and were thus subject to enhanced civil penalties for a willful violation under § 5321(a)(5)(C).

## III

The Horowitzes next contend that "[e]ven if the district court were correct on the willfulness issue," the court "still erred by failing to limit the penalty per willful violation to the $100,000 limit set by 31 C.F.R. § 1010.820(g)(2)." They acknowledge that this regulation was first promulgated in 1987 and, when promulgated, mirrored the statutory provision then in effect. They also acknowledge that Congress subsequently amended the statute in 2004 to increase the "maximum penalty" for a willful violation to "the greater of — (I) $100,000, or (II) 50 percent of" "the balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(C)–(D). But they argue that the 2004 statute should be understood as authorizing the Treasury Secretary to establish a *lower* maximum penalty by regulation, rather than as superseding the 1987 regulation's $100,000 maximum penalty. In support, they point out that the statute provides that "[t]he Secretary of the Treasury *may* impose a civil money penalty on any person who violates . . . any provision of section 5314." *Id.* § 5321(a)(5)(A) (emphasis added).

This argument, however, does not withstand a straightforward reading of the current version of the statute. Under the statutory language in effect from 1986 until 2004, a civil

20

penalty could be imposed only for a willful violation and the maximum penalty was "the greater of" $25,000 or "an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(B)(ii) (1986). The Secretary of the Treasury promulgated a regulation in 1987 parroting that statutory language. *See* 31 C.F.R. § 103.47(g)(2) (1987), *renumbered as* § 1010.820(g)(2). But in 2004, Congress amended the statute both to allow a civil penalty for non-willful violations, 31 U.S.C. § 5321(a)(5)(A), and to *increase* the maximum civil penalty for a willful FBAR violation to "the greater of" $100,000 or 50 percent of the balance in the account at the time of the violation, *id.* § 5321(a)(5)(C)(i), (D)(ii). Contrary to the Horowitzes' position, the statute's language is hardly consistent with an intent by Congress to allow the Secretary to impose a *lower* maximum penalty by regulation; rather, Congress *itself* set a specific "maximum penalty" for a willful violation. *Id.*

We conclude that the 1987 regulation on which the Horowitzes rely was abrogated by Congress's 2004 amendment to the statute and therefore is no longer valid. Accordingly, we affirm the district court's conclusion that the civil penalty for a willful FBAR violation is established by 31 U.S.C. § 5321(a)(5)(C)–(D), not 31 C.F.R. § 1010.820(g). *Accord Norman*, 942 F.3d at 1117–18 (rejecting the same argument and observing that, if accepted, that approach "would inappropriately prevent all newly created or amended statutes from taking effect until all inconsistent regulations are amended or repealed"); *see also United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) (observing that "[t]he Treasury's relaxed approach to amending its regulations to track Code changes is well documented").

21

# IV

Finally, the Horowitzes contend that disputes of material facts exist with respect to whether the government's action against them was barred by an applicable statute of limitations.

The Horowitzes were required to file their FBAR for 2007 by June 30, 2008, and their FBAR for 2008 by June 30, 2009. Their failure to do so by those dates triggered a six-year period during which the government was required to assess any civil penalty. *See* 31 U.S.C. § 5321(b)(1). Thus, because the last assessment date for the 2007 FBAR was June 30, 2014, the IRS was timely in issuing formal assessments of civil penalties against the Horowitzes on June 13, 2014. The formal assessments then triggered an additional two-year period during which the government was required to commence any enforcement action. *See id.* § 5321(b)(2). The question that the Horowitzes raise relates to whether the government withdrew its timely 2014 assessment and reinstated it in 2016, which would then be untimely.

In issuing the assessments in this case, the FBAR Penalty Coordinator at the Department of Treasury, Nancy Beasley, prepared four Form 13448 Penalty Assessment Certifications for execution and issuance against the Horowitzes. To prepare the forms, she manually inputted the necessary information into a computer database and then had the computer generate the official forms with the inputted information. The forms were then presented to her supervisor, CTR Operations Manager William Calamas, for his signature. In signing the forms, Calamas "certif[ied] that the penalt[ies] . . . , hereby assessed, are specified in supporting records." At the same time, Calamas also signed letters, prepared

22

by Beasley, notifying the Horowitzes that the penalties had been assessed and demanding payment. These facts are not disputed. Rather, the Horowitzes base their argument on what followed.

By letter dated June 3, 2014 — shortly before the assessment certifications were issued — the Horowitzes' counsel notified the IRS that the Horowitzes wanted to administratively appeal the then-proposed assessments. He enclosed forms consenting to an extension of the statute of limitations periods for both the 2007 and 2008 FBARs until December 31, 2015. As a result of counsel's letter, the administrative appeals process began, and the case was assigned to IRS Appeals Officer Grayse Rodrigo, who noticed that the Horowitzes had consented to an extension of the limitations period before the penalties had actually been assessed. Based on this observation, Officer Rodrigo sent an email to the IRS Appeals FBAR Coordinator, Daisy Batman, on October 16, 2014, asking her to have the four assessments against the Horowitzes "remove[d]." Batman, in turn, emailed Beasley stating that "[s]ince the 2007 and 2008 statutes will not expire until 12/31/2015, . . . the penalty was assessed prematurely and need[ed] to be removed/reversed for each year." Although Beasley had been in her position at the Treasury Department for nearly five years, Batman's email was the first time that Beasley had been asked to "remove/reverse" a penalty that had already been assessed. In response to the email, Beasley simply deleted "6/13/2014" (the assessment date) from the "date penalty input" field in the assessment database. But she did nothing more. Significantly, she generated no document, and her supervisor, Calamas, did not sign any document reversing the assessment certifications he had executed on June 13, 2014. Moreover, the Horowitzes

23

were never informed that the penalties against them had been placed back into an unassessed status.

The administrative appeals process continued until approximately May 2016 and, during that process, Appeals Officer Rodrigo and the Horowitzes' counsel discussed a potential settlement. Ultimately, however, Rodrigo informed the Horowitzes' counsel that there was insufficient time to obtain the necessary approval from the Justice Department, given that the government's time for filing suit was set to expire in June 2016 (*i.e.,* two years after the penalties were assessed in June 2014). As the Treasury Department was preparing to refer the case to the Justice Department, Batman again emailed Beasley about the status of the assessments. Batman stated that Beasley's October 2014 email, in which Beasley wrote that she had "removed the penalty input date," had led Batman to believe that "the penalty had been reversed." Batman requested that Beasley "send [her] another email confirming that the assessed FBAR penalty was never reversed." In her response, dated May 20, 2016, Beasley stated:

> You are correct. I did remove the date Penalty was input but did not clear the information. I was awaiting determination, now you have given it and it remains the same. I will input the original penalty input date and proceed with the referral to DOJ.

The matter was then referred to the Department of Justice, and the government commenced this action in June 2016 to collect the penalties that had been assessed.

Based on this series of events, the Horowitzes argue that "the district court erred in granting summary judgment to the Government" because there was at least a genuine issue of material fact as to whether the penalties against them were timely assessed. They argue

24

that with the deletion of the date in the database in October 2014, Beasley placed the case into an unassessed status. Under this scenario, the Horowitzes contend that "the penalties were not reassessed until May 2016," making them time barred.

Despite the various characterizations of the parties, our review of the record reveals that the material facts surrounding this statute of limitations issue are straightforward and undisputed. First, the civil penalties were formally assessed on June 13, 2014, when CTR Operations Manager Calamas signed the four assessment certifications. Second, in October 2014, Beasley deleted "6/13/2014" from the "date penalty input" field of the relevant database, but changed no other matter and issued no documents. Finally, in May 2016, Beasley reentered "6/13/2014" in the database after Batman asked for confirmation that the assessments had never been reversed.

We conclude as a matter of law that regardless of Beasley's subjective understanding of the effect of deleting the date from the database, her mere act of deleting that date did not have the *legal* effect of reversing the assessments that had been formally certified by Calamas on June 13, 2014. Accordingly, the civil penalties against the Horowitzes were timely assessed, and the enforcement action was timely filed.

\*       \*       \*

The judgment of the district court is accordingly

AFFIRMED.

25