# United States Court of Appeals for the Federal Circuit

---

**MINDY P. NORMAN,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-2408

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00872-EJD, Senior Judge Edward J. Damich.

---

Decided: November 8, 2019

---

PAULA SCHWARTZ FROME, Garden City, NY, argued for plaintiff-appellant.

DEBORAH K. SNYDER, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by GEOFFREY KLIMAS, RICHARD E. ZUCKERMAN, TRAVIS A. GREAVES, GILBERT STEVEN ROTHENBERG.

---

Before PROST, *Chief Judge*, MOORE and WALLACH,
*Circuit Judges*.

PROST, *Chief Judge*.

Mindy P. Norman appeals a July 31, 2018 decision by the U.S. Court of Federal Claims finding that: (a) Ms. Norman willfully failed to file a Report of Foreign Bank and Financial Accounts ("FBAR") in 2007; and (b) the Internal Revenue Service ("IRS") properly assessed a penalty of $803,530 for this failure.  For the reasons stated below, we affirm.

BACKGROUND

I

Ms. Norman, a school teacher, opened a foreign bank account with the Swiss bank UBS in 1999.  More specifically, she opened a "numbered account," which, unlike a "named account," means income and asset statements for the account list only the account number and not Ms. Norman's name or address.  From 2001 to 2008, her account balance ranged between approximately $1.5 million and $2.5 million.

Ms. Norman was actively involved in managing and controlling her account.  For instance, she frequently spoke with Mr. Thomann, her UBS representative, about the account, both in person and over the phone.  She gave UBS instructions detailing how to invest her funds.  For example, she signed a document inhibiting UBS from investing in U.S. securities on her behalf, which helped prevent disclosure of her account to the IRS.  She also withdrew funds from the account in 2002.  She received the withdrawal—which appears to have been either for $10,000 or

$100,000[1]—in cash from Mr. Thomann. That the withdrawal was received in cash again helped to prevent disclosure of the foreign account to the IRS.

UBS client contact records indicate that in April 2008, Ms. Norman expressed surprise and displeasure when she was informed of UBS's "new business model,"[2] which the Court of Federal Claims found referred to UBS's business decision to "no longer provide offshore banking" and to work "with the US Government to identify the names of US clients who may have engaged in tax fraud." *See Norman*, 138 Fed. Cl. at 194 (quoting statement by UBS representative Mark Branson while testifying at a Senate Subcommittee hearing). Just before UBS publicly announced this new business plan in July 2008, Ms. Norman closed her account with UBS and transferred her funds to another foreign bank.

## II

Under 31 U.S.C. § 5314(a), U.S. persons who have relationships with foreign financial agencies are required to disclose such relationships to the Treasury Department. This disclosure is effectuated by filing a Report of Foreign Bank and Financial Accounts ("FBAR").

---

[1] Banker's notes indicate that the withdrawal was for $100,000, but Ms. Norman claims that the withdrawal was for $10,000. The precise amount of Ms. Norman's withdrawal is unimportant for purposes of this appeal. What is important is that Ms. Norman knew she had control over her foreign account and could withdraw from it.

[2] J.A. 327, 330; *see also Norman v. United States*, 138 Fed. Cl. 189, 194 & n.8 (2018); Defendant's Motion for Summary Judgment, Defendant's Exhibits Vol. 3 at 28-2, 28-5, *Norman v. United States*, 138 Fed. Cl. 189 (2018) (No. 15-872T).

Ms. Norman did not file a timely FBAR disclosing the existence of her UBS account in any year, including in 2007, which is the tax year at issue in this case. In addition, Ms. Norman signed, under penalty of perjury, her 2007 tax return, which falsely indicated that she had no interest in any foreign bank account. She signed her tax return after her accountant sent her a questionnaire specifically inquiring whether she had an interest in any foreign bank accounts.

In 2008, Ms. Norman was referred to an accountant who filed amended tax returns and late FBARs. The IRS subsequently opened an audit of Ms. Norman. During this audit, Ms. Norman made numerous false statements to the IRS. For instance, Ms. Norman told the IRS, both during an interview and in a letter, that she first learned of her foreign account in 2009. In the letter, she further stated that she "was shocked to first hear about the existence of foreign accounts" in her name. J.A. 133. After retaining counsel, Ms. Norman sent the IRS a second letter "to correct several misstatements." J.A. 145–47. In this letter, she admitted that she had known for over a decade that she had an "interest" in a foreign bank account, but still stated that "none of the money in the account(s) was mine[,] and I did not consider myself to have any kind of control over the account." J.A. 146.

Pursuant to 31 U.S.C. § 5321(a)(5)(A), the Secretary of the Treasury has the authority to impose civil money penalties on any person who fails to file a required FBAR. From 1986 to 2004, § 5321 only authorized penalties for willful violations of § 5314 and capped such penalties at $100,000. In 2004, Congress amended § 5321 to authorize penalties up to $10,000 for non-willful violations of § 5321 and to increase the maximum penalty for willful violations to the greater of $100,000 or fifty percent of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(A)–(D).

The IRS assessed an \$803,530 penalty against Ms. Norman for willfully violating the FBAR reporting requirement. Ms. Norman paid the penalty in full and filed a complaint in the Court of Federal Claims requesting a refund. After a trial, the Court of Federal Claims upheld the penalty as appropriate. Ms. Norman appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Ms. Norman raises three issues on appeal. First, she argues that the Court of Federal Claims factually and legally erred in finding that her FBAR violation was willful. Second, Ms. Norman argues that a 1987 regulation issued by the Treasury Department limits penalties for willful FBAR violations to \$100,000. Third, Ms. Norman contends that the penalty imposed on her violates the Eighth Amendment. We discuss each in turn.

## I

Section 5321 sets a larger maximum penalty for willful violations of § 5314 than for non-willful violations. Ms. Norman argues that the Court of Federal Claims erred both legally and factually in concluding that her failure to comply with § 5314 was willful. She further argues that, therefore, the IRS can penalize her at most for a non-willful violation of § 5314. We disagree.

## A

As an initial matter, the parties dispute the meaning of willfulness in the context of § 5321. The Supreme Court has made clear that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Neither party has pointed to any authority indicating that a different standard applies here. Therefore, we hold, as did the Court of Federal Claims, that willfulness in the context of § 5321(a)(5)(C) includes recklessness. We

note that our interpretation of willfulness is consistent with both the Third and Fourth Circuits. *See Bedrosian v. United States*, 912 F.3d 144, 152–53 (3d Cir. 2018); *United States v. Williams*, 489 F. App'x 655, 658–59 (4th Cir. 2012).

Ms. Norman argues that willfulness in this context requires a showing of actual knowledge of the obligation to file an FBAR. *See* Appellant's Br. 30–31. Ms. Norman reasons that, if willfulness includes recklessness, then every failure to file an FBAR is willful, which would inappropriately render superfluous the portions of § 5321 relating to penalties for non-willful violations. *Id.* at 31. We disagree. For example, an FBAR violation would generally not be willful where a taxpayer did not know about, and had no reason to know about, her overseas account. Accordingly, our interpretation of willfulness does not render superfluous the portions of § 5321 relating to non-willful conduct.

Ms. Norman also argues that we should follow Internal Revenue Manual ("IRM") § 4.26.16.6.5.1(4), which states that "[w]illfulness is shown by the person's knowledge of the reporting requirements and the person's conscious choice not to comply with the requirements." It is well settled, however, that the IRM is not legally binding on courts. *See, e.g., Estate of Duncan v. Comm'r of Internal Revenue*, 890 F.3d 192, 200 (5th Cir. 2018). In any event, the IRM acknowledges that actual knowledge may not be required. According to the IRM, "the failure to learn of the filing requirements coupled with other factors, such as efforts taken to conceal the existence of the accounts and the amounts involved, may lead to a conclusion" that the taxpayer acted willfully. I.R.M. § 4.26.16.6.5.1(5). As discussed in more detail below, this scenario fits Ms. Norman's conduct.

B

Ms. Norman also argues that, irrespective of how willfulness is defined in this context, the Court of Federal Claims erred in determining that her failure to file an FBAR in 2007 was willful. We review this determination for clear error. *See Home Sav. of Am. v. United States*, 399 F.3d 1341, 1346 (Fed. Cir. 2005); *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1373 (Fed. Cir. 2001); *see also Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018) (finding that a "determination in a bench trial as to willfulness under the FBAR statute is reviewed for clear error").

The Court of Federal Claims did not clearly err in finding that Ms. Norman's failure to file an FBAR was willful. Ms. Norman signed her 2007 tax return under penalty of perjury, and this return falsely indicated that she had no interest in any foreign bank account. She did so after her accountant sent her a questionnaire that specifically asked whether she had a foreign bank account. In addition, the evidence shows that Ms. Norman took the following steps, each of which had the effect of inhibiting disclosure of the account to the IRS: (1) Ms. Norman opened her foreign account as a "numbered account"; (2) she signed a document preventing UBS from investing in U.S. securities on her behalf; and (3) the one time she withdrew money from the account, her Swiss bank account manager delivered the money to her in cash.

Moreover, once the IRS opened an audit of Ms. Norman, she made many false statements to the IRS about her knowledge of, and the circumstances surrounding, the account. Ms. Norman told the IRS, both during an interview and in a letter, that she first learned of the account in 2009. In her letter, she stated that she "was shocked to first hear about the existence of foreign accounts" in her name. In 2014, after retaining counsel, Ms. Norman sent the IRS another letter "to correct several misstatements." Although Ms. Norman admitted in this 2014 letter that she knew

"more than a decade ago" that she had an "interest" in a foreign bank account, she maintained in the 2014 letter that "none of the money in the Swiss account(s) was mine[,] and I did not consider myself to have any kind of control over the account." J.A. 146. In fact, Ms. Norman knew long before 2009 that she owned a foreign bank account and controlled its assets. She opened the account in 1999, actively managed the account for many years, and even withdrew money from the account in 2002.

In short, at the very least, Ms. Norman signed her 2007 tax return—which falsely indicated that she owned no interest in any foreign bank account—knowing that she owned a foreign bank account and controlled the assets within. Prior to 2007, Ms. Norman took steps to keep the account confidential from the government. And after the IRS opened an audit of Ms. Norman, she made numerous misstatements to the IRS about her knowledge and control of the foreign bank account. On these facts, we cannot say that the Court of Federal Claims clearly erred in finding that Ms. Norman willfully violated the FBAR requirement.

Ms. Norman argues that she could not have willfully violated § 5314 because she was merely following her mother's advice in opening and managing the account. But this argument is unavailing because our willfulness finding rests on affirmative acts taken by Ms. Norman herself, and Ms. Norman does not contend that her actions were the product of undue influence by her mother. *See, e.g.*, Oral Arg. at 8:45–9:10, No. 2018-2408, http://www.cafc. uscourts.gov/oral-argument-recordings. Actions can be willful even if taken on the advice of another.

Ms. Norman also argues that she could not have willfully violated the FBAR requirement because she did not read her 2007 tax return. But whether Ms. Norman ever read her 2007 tax return is of no import because "[a] taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or

she is charged with constructive knowledge of its contents." *Greer v. Comm'r of Internal Revenue*, 595 F.3d 338, 347 n.4 (6th Cir. 2010); *see also United States v. Doherty*, 233 F.3d 1275, 1282 n.10 (11th Cir. 2000) (finding that taxpayer "signed the fraudulent tax form and may be charged with knowledge of its contents"). The fact that Ms. Norman did not read her 2007 tax return supports that she acted recklessly toward the existence of reporting requirements. Moreover, the facts supporting a finding of willfulness in this case extend much further than Ms. Norman's failure to read her 2007 tax return.

In sum, we find that the Court of Federal Claims did not clearly err in determining that Ms. Norman willfully violated the FBAR requirement of § 5314.

## II

Next, Ms. Norman contends that the Court of Federal Claims legally erred in concluding that a 2004 amendment to 31 U.S.C. § 5321 rendered void 31 C.F.R. § 1010.820(g) (2010), a 1987 regulation capping penalties for willful violations of § 5314 at $100,000. We disagree.

From 1986 to 2004, § 5321 capped penalties for willful FBAR violations at $100,000. In 1987, the Treasury Department issued a regulation echoing this statutory language. 31 C.F.R. § 103.47(g)(2) (1987), *renumbered as* 31 C.F.R. § 103.57(g)(2) (1999), *renumbered as* 31 C.F.R. § 1010.820(g) (2010). In 2004, Congress amended § 5321 to increase the maximum penalty for willful violations to the greater of $100,000 or fifty percent of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(A)–(D). As of the date of this decision, the Treasury Department has not amended or repealed its 1987 regulation.

Ms. Norman argues that the Court of Federal Claims should have reduced her penalty to $100,000 because that is the maximum penalty authorized by the 1987 regulation.

The Government responds that the 2004 amendment to 31 U.S.C. § 5321(a)(5)(C) superseded the 1987 regulation. This is a legal question requiring statutory interpretation, which we review de novo. *BASR P'ship v. United States*, 915 F.3d 771, 776 (Fed. Cir. 2019).

The plain language of the statute, as amended in 2004, indicates that, for willful FBAR violations, "the maximum penalty . . . *shall* be increased to the greater of" $100,000 or fifty percent of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(A)–(D) (emphasis added). The use of the word "shall" means what follows is mandatory, not discretionary. *See, e.g.*, *Hyatt v. U.S. Patent & Trademark Office*, 797 F.3d 1374, 1380 (Fed. Cir. 2015). Accordingly, Congress set a maximum penalty that must govern whenever the IRS imposes a willful FBAR penalty.

Because the 1987 regulation sets forth a maximum willful FBAR penalty that is inconsistent with the maximum penalty mandated by statute, the 1987 regulation is no longer valid. *See, e.g.*, *R&W Flammann GmbH v. United States*, 339 F.3d 1320, 1324 (Fed. Cir. 2003); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1480 (Fed. Cir. 1997); *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1575 (Fed. Cir. 1996); *see also Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002).

Ms. Norman's arguments to the contrary are unpersuasive. First, Ms. Norman argues that § 5321 gives the Secretary discretion to set a lower maximum penalty. Ms. Norman relies on the statute's language that "[t]he Secretary of the Treasury *may* impose a civil money penalty on any person who violates" the FBAR requirement. 31 U.S.C. § 5321(a)(5)(A) (emphasis added). But the language relied upon by Ms. Norman—that the Secretary "may" impose a penalty—merely gives the Secretary discretion as to whether to impose a penalty in any particular case. This language does not mean that the Secretary has the

authority to set a penalty cap on all cases that is different than the penalty cap Congress mandated.

To the extent Ms. Norman argues that even if the 1987 regulation is inconsistent with § 5321 as amended in 2004, the 1987 regulation is binding on the IRS until it is repealed, that argument is meritless. It is well-settled that subsequently enacted or amended statutes supersede prior inconsistent regulations. *See, e.g.*, *R&W Flammann*, 339 F.3d at 1324 ("A regulation that contravenes a statute is invalid. The FOIA statute obligates the government to disclose non-exempt information and super[s]edes purportedly contradictory regulatory requirements."); *Barseback Kraft*, 121 F.3d at 1480 ("The fact that the DOE's Enrichment Criteria had not been formally withdrawn from the Code of Federal Regulations does not save them from invalidity. A 'regulation cannot override a clearly stated statutory requirement.'" (quoting *Aerolineas Argentinas*, 77 F.3d at 1575)); *see also Farrell*, 313 F.3d at 1219 ("It is well-settled that when a regulation conflicts with a subsequently enacted statute, the statute controls and voids that regulation."). Ms. Norman's position to the contrary would inappropriately prevent all newly created or amended statutes from taking effect until all inconsistent regulations are amended or repealed.

Ms. Norman further contends that the 1987 regulation constitutes an interpretation of 31 U.S.C. § 5321 that warrants *Chevron* deference. But even if the 1987 regulation constitutes an interpretation of 31 U.S.C. § 5321, the 1987 regulation is not entitled to *Chevron* deference. Because the statute is unambiguous, we "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

In conclusion, we find that the 2004 amendment to 31 U.S.C. § 5321 rendered void the 1987 regulation capping penalties for willful violations of § 5314 at $100,000.

## III

Finally, Ms. Norman contends that the penalty imposed upon her constitutes an excessive fine under the Eighth Amendment. We decline to reach this issue because Ms. Norman failed to properly preserve it. Ms. Norman first advanced this argument in her second post-trial letter to the Court of Federal Claims, which requested permission to supplement her summary judgment opposition with this Eighth Amendment argument. This letter was sent after her opposition to the Government's summary judgment motion, after trial, and after her first post-trial submission. The Court of Federal Claims properly exercised its discretion in denying Ms. Norman's untimely request. As a result, we find that this argument is waived and decline to address it.

## Conclusion

We have considered Ms. Norman's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the decision of the Court of Federal Claims.

**AFFIRMED**