[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14464

_____

D.C. Docket No: 8:17-cv-00826-MSS-AEP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAID RUM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 23, 2021)

Before ROSENBAUM, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

This case involves the Government's suit brought in the district court to enforce the IRS assessment of a penalty against Rum for failing for the year 2007 to file a Report of Foreign Bank and Financial Accounts ("FBAR") pursuant to 31 U.S.C. § 5321. The district court granted summary judgment in favor of the Government, enforcing the IRS assessment of a penalty for a willful violation. This is Rum's appeal. He argues on appeal: (A) that the district court applied an incorrect standard of willfulness (by holding that willfulness as used in 31 U.S.C. § 5321(a)(5)(C) includes a reckless disregard of a known or obvious risk); (B) that the district court erred in concluding that there were no genuine issues of material fact as to whether his conduct rose to required level of willfulness/recklessness; (C) that the district court erred in refusing to recognize that 31 C.F.R. § 1010.820(g)(2) limits the amount of a willful violation to $100,000; (D) that the district court erred when it held that the IRS's factfinding procedures were sufficient and therefore applied the arbitrary and capricious rather than a de novo standard of review with respect to the amount of the penalty; (E) that, even assuming the arbitrary and capricious standard applies, the district court erred in failing to conclude that the IRS factfinding procedures were arbitrary and capricious; and finally, (F) that the district court erred in rejecting Rum's challenge to the additions to the base amount (interest and late fees). In our Part III Discussion below, we address each of Rum's arguments in turn.

## I. FACTS AND PROCEDURAL HISTORY

Rum has been a naturalized citizen of the United States since 1982 and can read, write, and comprehend English. After obtaining a two-year degree, Rum owned and operated several businesses including a delicatessen, a pet supply store, and a convenience store. In 1998, Rum opened his first foreign bank account ("UBS account") by depositing $1.1 million from his personal checking account. Rum opened the UBS account to conceal money from potential judgment creditors, although Rum provided two inconsistent versions concerning the details of the lawsuits giving rise to the judgment creditors. In one version, he was in a car accident and was sued by the victim of the accident; in the second, he was sued by a customer who slipped and fell inside his store. Rum alleged that his lawyer advised him to place the money in a foreign bank account for concealment purposes. Rum chose to have a numbered, rather than a named, account, and elected to have his mail held at UBS, rather than sent to his U.S. address. UBS charged a fee to retain his mail and all retained mail was deemed to have been duly received by him.

Rum gave inconsistent statements on why he failed to return the money to the U.S. earlier. Rum stated that he was afraid of being penalized with a fee for closing the foreign bank account, but he also declared that he was satisfied with

3

returns on investment and thus decided to leave the funds undisturbed. Rum admitted that "he was very active with communicating investment strategies to UBS" because he "wanted to ensure he was getting the best return on his investment with UBS." For that reason, he visited Switzerland several times to meet with bank officers and manage his account.

From 2002 to 2008, UBS sent bank statements to Rum that included the following notice on the cover: "The information contained herein is intended to provide you with information which may assist you in preparing your US federal income tax return. It is for information purposes only and is not intended as formal satisfaction of any government reporting requirements." UBS informed Rum in 2002 that earnings from U.S. securities had to be reported to the IRS. However, Rum declined to complete Form W-9 and instead directed UBS not to invest in U.S. securities. While in Switzerland, in 2004, Rum signed a document entitled "Supplement for new Account US Status" that contains the following statement: "In accordance with the regulations applicable under US law relating to withholding tax, I declare, as the holder of the above-mentioned account, that I am liable to tax in the USA as a US person." Rum's UBS account balance greatly exceeded the reportable amount in 2007 and his UBS account earned income each year, except for 2006. Rum owned the UBS account until October 26, 2008, when he closed it to transfer nearly $1.4 million to Arab Bank, another bank located in

4

Switzerland.  Rum admitted that while he did not disclose the UBS account on his tax returns or the Free Application for Federal Student Aid ("FAFSA"), he disclosed the account on his mortgage application to demonstrate his strong financial position.

Rum asserts that he used a tax preparer to complete his returns.  However, Rum's 2007 tax return is one of at least two tax returns that is marked as "Self-Prepared" on the tax preparer's signature line.  Rum signed the 2007 tax return on February 27, 2008; this signature is found on Form 1040 immediately below the following standard provision: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete."  Rum asserts that he provided his tax preparer with the documents necessary to prepare the returns.  Rum admits that he never told the tax preparer about his foreign bank account and claims that the tax preparer never asked him about the existence of a foreign bank account.  Line 7a of Schedule B of the 2007 Form 1040 tax return contains the following question: "At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See instructions for exceptions and filing requirements for Form TD F 90-22.1

5

[FBAR]." Rum's 2007 tax return, and each of his returns for several preceding years, stated that Rum had no such foreign account.

In 2008, Rum was audited for the 2006 tax year. Rum told the agent that he had closed his UBS account but failed to tell her that he opened the new one at Arab Bank. Although the agent imposed additional taxes, she did not impose an FBAR penalty.

Rum failed to file an FBAR repeatedly prior to tax year 2008; in fact, Rum filed an FBAR for tax year 2008 only because on October 6, 2009, UBS sent a written notice to Rum stating that Rum's account with UBS appeared to be within the scope of the IRS Treaty Request it had received. Nine days later, Rum belatedly filed his first FBAR form, on October 15, 2009, for tax year 2008.

In November 2009, Arab Bank advised Rum that it was closing his account, so he transferred the funds—which were approximately $1.4 million—to a U.S. account. In February 2010, Rum filed a tax return for the 2009 year that reported approximately $40,000 of the $300,000 of investment income generated by the UBS and Arab Bank accounts.

In 2011, the IRS commenced an examination that encompassed Rum's 2005 and 2007 through 2010 tax years and led to an examination of his failure to report his foreign accounts during that period. Agent Marjorie Kerkado determined that Rum had understated his income by hundreds of thousands of dollars during the

years at issue and therefore asserted tax deficiencies and civil fraud penalties. She initially proposed a non-willful FBAR penalty against Rum, which her supervisor, Terry Davis, approved subject to the approval of area counsel. Kerkado and Davis initially proposed a non-willful penalty instead of a willful penalty based on the failure of the IRS agents to raise an FBAR penalty in Rum's 2006 audit. Area counsel's approval of the non-willful penalty was accompanied by the following language:

> It is our understanding that the revenue agent did not propose a willful penalty in this case because the prior revenue agent failed to raise the issue of filing FBAR forms in the earlier examination. In the absence of additional facts not stated in this memorandum, this office believes that there is sufficient evidence to impose the willful penalty should the Commissioner make that determination. Any evidence that the prior revenue agent failed to raise the FBAR issue should be inadmissible in a court proceeding as not relevant to determining the taxpayer's intent at the time the violations were committed.

Once Kerkado and Davis realized that their initial reasoning was based on an irrelevant "factor when it comes to willful definition," Kerkado reconsidered Rum's case and proposed a willful penalty. Both Davis and area counsel approved Kerkado's proposal and Kerkado never thereafter recommended anything lower than a willful penalty of 50% of the account balance at the time of the violation.

Both Davis and area counsel agreed with Kerkado that Rum was ineligible under the mitigation guidelines because of the proposed civil tax fraud penalty. The Internal Revenue Manual ("I.R.M.") provides that if the maximum balance of

7

the account exceeds a million dollars at the time of the violation, the FBAR statutory maximum applies.  It is undisputed that the account exceeded a million dollars during tax year 2007; however, the I.R.M. mitigation guidelines provide for an exception such that the statutory maximum could be reduced if a taxpayer meets four mitigating factors.  One of those four that Rum clearly did not meet provided: "IRS did not determine a fraud penalty … due to the failure to report income related to any amount in a foreign account."  I.R.M. § 4.26.16-1.

Kerkado submitted a Summary Memo detailing the basis for why a willful penalty was resubmitted instead of the non-willful penalty, in which she specifically noted that the mitigation guidelines were considered and determined not to be applicable due to a civil fraud penalty being proposed and appealed. Kerkado's FBAR Examination Lead Sheets also contain a notation demonstrating that she considered the I.R.M. mitigation guidelines in Rum's exam.

On June 3, 2013, at the conclusion of Rum's IRS examination, the IRS sent Rum a Letter 3709 stating that it was "proposing a penalty" for willful failure to file the FBAR; the letter cited the amended statute that provided for the maximum penalty of 50% of the account at the time of violation.  The previous year Kerkado had sent Rum a letter informing him that because an agreement could not be reached pursuant to her offer of a reduced FBAR penalty (20% of the balance of his account) in exchange for agreeing to the civil fraud penalty, the maximum

8

statutory penalty would apply for one tax year. The June 3, 2013, Letter 3709 further explained that Rum could accept the penalty, appeal the decision, or do nothing and the IRS would assess the penalty and begin collection procedures. Along with the Letter 3709, Rum was provided with a Form 886-A Explanation of Items. The Form set forth the detailed basis upon which the IRS proposed the willful penalty against Rum. While Kerkado had the authority to recommend the assessment of the willful FBAR penalty against Rum for several tax years, she exercised her discretion to recommend the imposition solely for tax year 2007.

On July 2, 2013, Rum elected to appeal the proposed willful penalty by stating that he sought the "discretionary Assessment whereby the Penalty cannot exceed $10,000." Appeals Officer Svetlana Wrightson issued an Appeals Memorandum that sustained the willful FBAR penalty against Rum.

Rum then filed a petition with the Tax Court, challenging the IRS's civil fraud penalty determination under 26 U.S.C. § 6663. The Tax Court entered a stipulated order based on a settlement whereby Rum would not be subject to a civil fraud penalty but imposed accuracy-related penalties under § 6662 for underpayment of tax required to be shown on a return.[1]

---

[1] The Government does not argue that Rum's challenge in this action to the FBAR penalty is precluded by res judicata or otherwise. See Williams v. Comm'r, 131 T.C. 54 (2008) (holding that challenges to FBAR penalties do not fall within its jurisdiction).

The Government then brought this action against Rum to collect the outstanding FBAR penalty under 31 U.S.C. § 5321(a)(5)(C) for calendar year 2007. The district court referred the matter to the magistrate judge who recommended granting the Government's motion for summary judgment and denying Rum's. The magistrate judge rejected Rum's arguments that willfulness did not include recklessness and that the court should employ the maximum penalty found at 31 C.F.R. § 1010.820(g)(2) rather than the one found at 31 U.S.C. § 5321. It further found that no genuine issue of material fact existed concerning his willfulness. Turning to the penalty itself, the magistrate judge held that the IRS had not acted arbitrarily or capriciously when it imposed the 50% penalty. The magistrate judge set forth in detail the considerable evidence which supported the civil fraud penalty and the imposition of the maximum FBAR penalty. It also rejected Rum's arguments that the IRS decision should be reviewed de novo because of evidence of the IRS's bad faith and/or because he did not receive proper notice of the penalty. The district court adopted the recommendation, and Rum now appeals.

## II. STANDARD OF REVIEW

The parties have cited, and we have uncovered, no case in our Court—in the context of an IRS suit to enforce its assessment of an FBAR penalty—establishing the appropriate standard of review of the willfulness issue or the issue of the

exercise of discretion by the IRS with respect to imposition of the penalty and the amount thereof. Indeed, the parties provided no such briefing at all either in the district court or on appeal. Because of the lack of briefing and because our independent research has revealed no definitive resolution of the appropriate standard of review, we assume arguendo, but expressly decline to decide, that the standards of review are the standards of review urged by the parties both in the district court and on appeal. The court below employed the same standards. The parties ask us to review de novo the willfulness issue, and because the posture is one of summary judgment, whether or not there existed genuine issues of material fact with respect to whether or not Rum's failure to file the FBAR reports was willful. [2] Similarly, we address legal issues de novo, including whether the district court applied the correct legal standard of willfulness, and the propriety of using § 5321 for determining the maximum penalty rather than the regulation found at 31

---

[2]    Other courts have employed de novo review where the government has brought an action to collect FBAR penalties. See, e.g., United States v. Horowitz, 978 F.3d 80 (4th Cir. 2020) (using, without discussing, de novo standard in appeal from grant of motion for summary judgment); United States v. Williams, No. 1:09-cv-437, 2010 WL 3473311 (E.D. Va. Sept. 1, 2010), rev'd on other grounds, 489 F. App'x 655 (4th Cir. 2012) (using de novo review, noting that § 5321 contained no guidance on the legal standards to be employed in the action for collection it authorized, and comparing section to review of Tax Court and other agency decisions). We further note that this Court, in United States v. McMahan, 569 F.2d 889 (5th Cir. 1978) (en banc), held that a defendant, in an action brought by the United States to collect unpaid withholding taxes and associated penalties, has the right to a jury trial to determine if he is the responsible person. That decision addressed the right to trial by a jury when the claims to be tried involve both legal and equitable claims; it made no mention of the arbitrary and capricious standard.

C.F.R. § 1010.820(g)(2). With respect to the other issues raised, we employ the arbitrary and capricious standard pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as do the parties.

### III. DISCUSSION

A. The meaning of willfulness

1. Willfulness includes recklessness

Rum argues that the district court erred when it applied a standard of willfulness that includes reckless disregard of a known or obvious risk of nonpayment. He argues that the proper standard should be violation of a known legal duty, which is the standard used in criminal cases under the Bank Secrecy Act.

Congress passed the Bank Secrecy Act in 1970 in response to "serious and widespread use of foreign financial facilities located in secrecy jurisdictions for the purpose of violating American law." H.R. Rep. No. 91-975 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4397. Under 31 U.S.C. § 5321(a)(5)(A), the Secretary of the Treasury has the authority to impose civil money penalties on any person who fails to file a required FBAR. From 1986 to 2004, § 5321 only authorized penalties for willful violations and capped such penalties at $100,000. In 2004, Congress amended § 5321 to authorize penalties up to $10,000 for non-willful violations and to increase the maximum penalty for willful violations to the greater

12

of $100,000 or fifty percent of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(A)–(D).

In civil cases, willfully has traditionally been interpreted to include recklessness. In <u>Safeco Insurance Co. of America v. Burr</u>, 551 U.S. 47, 127 S. Ct. 2201 (2007), while examining the Fair Credit Reporting Act, the Court noted that "'willfully' is a word of many meanings whose construction is often dependent on the context in which it appears, and where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." 551 U.S. at 57, 127 S. Ct. at 2208 (internal quotations and citations omitted). Like the Bank Secrecy Act, the Fair Credit Reporting Act contained both criminal and civil penalties and both included willfulness as the standard for violations. However, the Court rejected the call to require actual knowledge for both, limiting that higher standard to the criminal penalties. <u>Id.</u> at 60, 127 S. Ct. at 2210.

Other courts addressing this issue in the context of FBAR civil penalties have held that willfulness includes reckless disregard. "Though 'willfulness' may have many meanings, general consensus among courts is that, in the civil context, the term often denotes that which is intentional, or knowing, or voluntary, as distinguished from accidental, and that it is employed to characterize conduct marked by careless disregard whether or not one has the right so to act."

13

Bedrosian v. United States, 912 F.3d 144, 152 (3d Cir. 2018) (internal quotations

and citations omitted); see also United States v. Horowitz, 978 F.3d 80, 89 (4th

Cir. 2020) (discussing Safeco and holding in the context of a civil penalty that a

"willful violation" of the FBAR reporting requirement includes reckless

violations); Norman v. United States, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (citing

Safeco and holding "that willfulness in the context of § 5321(a)(5)(C) includes

recklessness").

In United States v. Malloy, 17 F.3d 329 (11th Cir. 1994), we rejected a

taxpayer's similar willfulness argument in a suit brought by the government to

collect unpaid withholding taxes pursuant to 26 U.S.C. § 6672.  We noted that we

had previously held that willfully, under § 6672,

> is defined by prior cases as meaning, in general, a voluntary,
> conscious, and intentional act, such as payment of other creditors in
> preference to the United States, although bad motive or evil intent
> need not be shown.  The willfulness requirement is satisfied if the
> responsible person acts with a reckless disregard of a known or
> obvious risk that trust funds may not be remitted to the Government,
> such as by failing to investigate or to correct mismanagement after
> being notified that withholding taxes have not been duly remitted.

17 F.3d at 332 (quoting Mazo v. United States, 591 F.2d 1151, 1154 (5th Cir.

1979).[3]  We emphasized that something less than actual knowledge was sufficient

---

[3]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court
adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior
to the close of business on September 30, 1981.

to be liable and specifically restated the test of "a reckless disregard of a known or obvious risk." Id.

Following our precedent interpreting the analogous language in § 6672, we hold that willfulness in § 5321 includes reckless disregard of a known or obvious risk. In so doing, we join with every other circuit court that has interpreted this provision.

2. The meaning of recklessness

The Safeco Court stated that "[w]hile the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." 551 U.S. at 68, 127 S. Ct. at 2215 (internal quotations and citations omitted).

Both the Fourth Circuit and the Third Circuit have adopted the Safeco standard in the context of the FBAR penalty:

> [C]ivil recklessness requires proof of something more than mere negligence: "It is [the] high risk of harm, objectively assessed, that is the essence of recklessness at common law." Safeco, 551 U.S. at 69, 127 S. Ct. 2201. Thus, as the Third Circuit has held, when imposing a civil penalty for an FBAR violation, willfulness based on recklessness is established if the defendant "(1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily." Bedrosian, 912 F.3d at 153 (cleaned up).

15

Horowitz, 978 F.3d at 89; accord Norman, 942 F.3d at 1115 (citing Safeco and Bedrosian and holding: "the failure to learn of the filing requirements coupled with other factors, such as efforts taken to conceal the existence of the accounts and the amounts involved, may lead to a conclusion that the taxpayer acted willfully" (internal quotation omitted)).

We join our sister circuits in holding that the appropriate standard of willfulness to warrant the FBAR penalty is—borrowing from Safeco—"an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."

We turn next to address Rum's argument that, in applying the Safeco standard of recklessness, the district court erred in failing to conclude that there were genuine issues of fact.

### B. Genuine issue of material fact

Rum argues that the district court erred when it determined that no genuine issue of material fact existed as to his willfulness (i.e., recklessness pursuant to our holding above). Pursuant to the summary judgment standard, he correctly asserts that he is entitled to all inferences in his favor, but he argues that the district court ignored this standard. Rum's primary argument is that his signature on the tax return is not sufficient, by itself, to conclude that he had constructive knowledge of the negative answers on his tax returns about the existence of a foreign bank

16

account.  However, we need not rely solely on Rum signing his returns.  As we demonstrate below, Rum's signature on his returns is but one among many facts that constitute overwhelming evidence that Rum acted in a manner that at least rises to the level of the recklessness standard described above.

Based on Rum's conduct, we agree with the district court that there are no genuine issues of material fact regarding Rum's willfulness or recklessness.  Rum admits that he started his first overseas account to hide assets from a judgment creditor (although his story changed about the origins of that judgment).  He opened a numbered account so as to conceal his ownership and paid an extra fee to UBS for not receiving his statements.  Additionally, he opened his second account as a numbered account, thus continuing to conceal his identity.[4]  He spurned repeated advice—in his UBS bank statements—indicating that the bank statements could assist him in preparing his U.S. federal tax return, and thus suggesting that his account would give rise to liability for U.S. federal taxes.  Although he did not receive these bank statements contemporaneously, he personally visited UBS in Switzerland several times and would have seen the statements then.  All of this was well before his 2007 tax return was filed and his 2007 FBAR report was due.

---

[4]    In a "numbered" account, a number rather than a name identifies the account.  This, together with the "hold mail" service, "allowed U.S. clients to eliminate the paper trail associated with the undeclared assets."  Horowitz, 978 F.3d at 83; see also Norman, 942 F.3d at 1116.

Indeed, in 2002, Rum's UBS adviser explained that income from U.S. securities was required to be reported to the IRS, that Rum would have to file a W-9 form, and that the bank would be required to withhold. Rum declined to complete the W-9, but instead directed UBS not to invest in U.S. securities. Moreover, in 2004, on a visit to UBS in Switzerland, he signed a form expressly declaring that: "In accordance with regulations applicable under US law relating to withholding tax, I declare, as the holder of the above-mentioned account, that I am liable to tax in the USA as a US person."

Rum reported the account when applying for a mortgage, to demonstrate his financial strength. However, he did not report the account when applying for financial aid for his children's college expenses, or when filing his tax returns. That is, he reported the account only when beneficial to him.

Although he stated that he thought he was not obligated to pay taxes on his earnings until they were repatriated, he reported only $40,000 of the $300,000 that he earned when he did repatriate the funds. Rum admitted that "he was very active with communicating investment strategies to UBS" because "he wanted to ensure he was getting the best return on his investment with UBS," and visited Switzerland several times to meet with bank officers and manage his account.

Rum filed numerous years of tax returns on which he answered "no" to the question of whether he had any interest in a foreign bank account. He now states

18

that some of the returns were prepared by a professional tax preparer but Rum concedes he did not tell the preparer about the accounts. Although he now says he used a paid preparer, his returns indicated they were self-prepared, which would mean that he even more probably read the instructions and would have seen Line 7a of Schedule B of the 2007 Form 1040 tax return, which asks: "At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See instructions for exceptions and filing requirements for Form TD F 90-22.1 [FBAR]." In any event, whether or not Rum prepared the returns himself, or paid a preparer, Rum signed all of his returns immediately below the warning: "Under penalties of perjury, I declare that I have examined this return and the accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete."

When audited in 2008, for the 2006 tax year, Rum sent the revenue agent a bank statement from UBS showing zero income and told the agent the account had been closed. However, at that time the UBS account had been closed about a year, and Rum did not tell the revenue agent that the UBS funds had simply been transferred to another Switzerland bank, thus evidencing his intent to conceal.

Rum filed only one FBAR for all of the years that he was required to do so. That FBAR was filed, belatedly in October 2009, for the tax year 2008. It was

19

filed only after UBS informed him that his account appeared to be within the scope of the treaty request it had received, and that UBS had disclosed to the IRS the existence of his account. Significantly, Rum did not file an FBAR for the tax year 2009 despite affirmatively knowing of his responsibility as a result of filing the 2008 FBAR.

In sum, the evidence was overwhelming that Rum sought to hide his overseas accounts from the United States government. Repeatedly he took steps to conceal the accounts and not report his income to the government. And this was notwithstanding that in 2004, on occasion of a visit to UBS in Switzerland, he signed a form expressly acknowledging that, as a holder of the UBS account, he was liable to tax in the United States, and that as early as 2002 it was explained to him that the income from his account was taxable in the U.S. Even viewing the evidence in the light most favorable to him, it is clear that he chose to act in a manner that at least rises to the level of "entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." Safeco, 551 U.S. at 68, 127 S. Ct. at 2215. There is no genuine issue of material fact to the contrary.

### C. The maximum penalty is established by the 2004 amendment to the statute, not by the regulation in 31 C.F.R. § 1010.820(g)(2)

Rum argues that the district court erred when it held that the 2004 amendments to § 5321 implicitly superseded the regulation found at 31 C.F.R. §

1010.820(g)(2). Before 2004, § 5321 created penalties only for willful violations and the regulation merely effectuated the statute—i.e. setting the maximum at the statutory maximum of $100,000 at the time. In 2004, Congress introduced a penalty for non-willful violations and raised the maximum penalty for willful non-filers. The Financial Crimes Enforcement Network ("FinCEN") is charged with creating the regulations, and Rum argues that FinCEN has declined to amend the regulation to set forth the new maximum penalty. He argues this represents FinCEN's policy to limit penalties for willful non-filings to $100,000. For the reasons that follow we disagree.

The plain text of § 5321(a)(5)(C) makes it clear that a willful penalty may exceed $100,000 because it states that the maximum penalty "shall be . . . the greater of (I) $100,000, or (II) 50 percent of the amount determined under subparagraph (D)," which is the balance of the account. The regulation was promulgated in 1987 and mirrored the language of the statute at that time but was never updated. "[T]he statute's language is hardly consistent with an intent by Congress to allow the Secretary to impose a lower maximum penalty by regulation; rather, Congress itself set a specific 'maximum penalty' for a willful violation." Horowitz, 978 F.3d at 91; see also Norman, 942 F.3d at 1117–18 (rejecting same argument and noting that accepting it would mean that all regulations had to be updated before conflicting statutes took effect).

21

We join our sister circuits and hold that the maximum penalty for a willful violation is established by § 5321(a)(5)(C) and (D)—not by the regulation found at 31 C.F.R. § 1010.820(g)(2).

### D.  Entitlement to de novo review of the penalty amount

As noted above in Part II, Rum assumes that the IRS determination and assessment of the FBAR penalty, and the amount thereof, would ordinarily be subject to the usual arbitrary and capricious standard of review under the Administrative Procedure Act.  However, Rum argues that the assessment of the penalty, and the amount thereof, should be subject to de novo review in his case because, he argues, his case falls within the exception provided for in 5 U.S.C. § 706(2)(F) "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate."  Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S. Ct. 814, 823 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S. Ct. 980 (1977).[5]

---

[5]    In Citizens to Preserve Overton Park, the Court rejected the plaintiffs' argument that de novo review should be employed, limiting such review to cases where "the action is adjudicatory in nature and the agency factfinding procedures are inadequate" and "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action."  401 U.S. at 415, 91 S. Ct. at 823.  The net effect of this ruling, the Fifth Circuit has commented, is that "de novo review of agency adjudications has virtually ceased to exist."  Sierra Club v. Peterson, 185 F.3d 349, 368 (5th Cir. 1999), vacated on reh'g en banc and rev'd on other grounds, 228 F.3d 559 (5th Cir. 2000); Cmty. for Creative Non-Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990) ("Only in the rare case in which the record is so bare as to frustrate effective judicial review will discovery be permitted under the second exception noted in Overton Park."); see also Porter v. Califano, 592 F.2d 770, 782–84 (5th Cir. 1979) (applying the § 706(2)(F) exception and holding the agency factfinding procedures there were inadequate

22

Rum proffers several reasons why the IRS factfinding proceedings here were so insufficient as to mandate de novo review rather than the usual arbitrary and capricious review.  We address in turn each of his reasons and conclude that they are wholly without merit.  However, we note at the outset that his reasons all rely upon the Internal Revenue Manual ("I.R.M."), which "does not have the force of law," but is instead merely "persuasive authority."  Romano-Murphy v. Comm'r, 816 F.3d 707, 719 (11th Cir. 2016).

First, Rum argues that the Revenue Agent has discretion to determine whether to assess the penalty and in what amount, citing I.R.M. § 4.26.16.6.7. Rum argues, however, that Kerkado indicated that she had no discretion and that her manager, Davis, ordered her to change the penalty from non-willful to willful and to charge the maximum penalty. We conclude that Rum's argument is wholly without merit.  In § 5321(a)(5), Congress authorized the Secretary to exercise discretion when setting the penalty amount.  Although the I.R.M. provides the examining agent with the discretion to set the amount of the penalty, it requires

---

where the officials accused of corruption by the plaintiff played a "pervasive role" in the factfinding).  We need not in this case decide precisely where the line should be drawn, but the caselaw suggests that the ordinary arbitrary and capricious standard of review should apply in the absence of an insufficiency in the factfinding procedures of considerable significance.  As our discussion in the text below indicates, Rum's several arguments in this regard are wholly without merit, and he fails to come close to that line.

23

"written approval of the examiner's manager," I.R.M. § 4.26.16.4.7(2) (2008),[6]

and submission to area counsel for review, I.R.M. § 4.26.17.4.3 (2008). Thus, the

examining agent did not have unfettered discretion; rather, under the I.R.M. the

IRS had discretion to set the penalty through its various employees.

Second, Rum argues that the IRS improperly withheld from him the

mitigation guidelines, thus preventing him from a fair opportunity to contest the

amount of the penalty in the appeals process and to argue for mitigation. Rum's

argument in this respect is wholly without merit for several reasons. The

mitigation guidelines are publicly available on the IRS website as well as Westlaw

and LexisNexis, and thus were available to Rum and counsel. Moreover, his

argument—that not having the mitigation guidelines deprived him of an

opportunity to argue that the facts and circumstances of his case warranted an

exercise of discretion for the imposition of no penalty or a reduced penalty—is

belied by the fact that he did, in fact, make those arguments in the appeals process.

Also, Rum does not identify in his opening brief on appeal what additional facts

---

[6]    This older version of the I.R.M., which was in force at the time of the Rum audit, reads:
When a penalty is appropriate, IRS has established penalty mitigation guidelines
to aid the examiner in applying penalties in a uniform manner. The examiner may
determine that a penalty under these guidelines is not appropriate or that a lesser
penalty amount than the guidelines would otherwise provide is appropriate or that
the penalty should be increased (up to the statutory maximum). The examiner
must make such a determination with the written approval of the examiner's
manager and document the decision in the workpapers.

I.R.M. § 4.26.16.4.7(2) (2008).

and circumstances he might have argued had he had access to the mitigation guidelines.  Finally, because the IRS at every level did in fact determine and sustain the fraud penalty, the mitigation guidelines on their face indicate that they could be of no benefit to Rum.

Third, Rum argues more generally that Kerkado failed to explain why the willful penalty was imposed and why the penalty was set at 50% of the value of Rum's UBS account, thus depriving him of a fair opportunity to contest the penalty in the appeals process.  We readily reject this argument.  The Form 886-A—which Rum acknowledges receiving before the appeals conference—amply explains both the factual and legal basis for imposing the penalty.  The Form 886-A sets out the relevant statutes and regulations and sets forth extensively the factual basis on which Kerkado was relying in imposing the penalty.  That factual basis included, inter alia: that his UBS advisor had explained to him in 2002 that the income from his account was taxable in the U.S., but he failed to complete the required W-9 form (thus concealing the existence of his account from the IRS); that he knowingly and willfully failed to report his income from his Switzerland accounts in his tax returns for 2005, 2007 and 2008; that he filed every tax return checking a box indicating that he did not have any interest in a foreign account; and that in 2008, during the audit of his 2006 tax return, he had an opportunity to disclose his then-existing Arab Bank account, but failed to do so, disclosing only the UBS

25

account of which he thought the IRS was already aware, and stating that he had closed the UBS account. Rum's argument that he was denied a fair opportunity to contest the penalty in the appeals process is totally without merit.

Fourth, Rum argues that Kerkado improperly merged his FBAR penalty examination and the tax return examination when she offered him an improper bargain. Initially, we note that Rum cites the I.R.M. for the proposition that the two examinations cannot be merged. However, this merger argument was not presented during the IRS proceedings and is therefore waived. Moreover, nothing in the cited provision of the I.R.M. precludes settlement offers, as made by Kerkado in this case. Indeed, Congress has expressly authorized the IRS to negotiate compromised penalties under 26 U.S.C. §§ 7121 (Closing Agreements) and 7122 (Compromises). Employing her discretion, Kerkado offered Rum the same terms he would have received had he qualified for the Offshore Voluntary Disclosure Program in return for not contesting his civil fraud penalty: 20% instead of the 50% that would otherwise be imposed. There was no improper bargaining here. Rather, Kerkado proposed a global settlement; it was an authorized settlement offer, not a threat of unwarranted penalties as a bargaining point.

Fifth, Rum makes a conclusory argument that Appeals Officer Wrightson created a new issue at the appeals level by denying the use of the mitigation guidelines because Rum did not cooperate with the IRS during the investigation.

26

The I.R.M. prohibits the consideration of new issues at the appeals level, I.R.M. § 8.6.1.6.2(1) (2013), but permits consideration of "new theories and/or alternative legal arguments," I.R.M. § 8.6.1.6.2(3) (2013).  This argument too is wholly without merit.  It is not certain that Rum's complaint involves a new "issue" not permitted by the I.R.M.  In any event, Appeals Officer Wrightson cited Rum's lack of cooperation merely as an alternative reason that he did not qualify for the mitigation guidelines, the fraud penalty being the primary reason.

In sum, Rum's several arguments that the IRS factfinding proceedings were so insufficient as to warrant de novo review—in departure from the usual arbitrary and capricious review—are wholly without merit.

E. Arbitrary and capricious review

Raising the same alleged flaws in the process, Rum argues that this Court should hold that the IRS's actions in determining his FBAR penalty were arbitrary and capricious.  However, because we determined above that the actions were not improper, we hold that the IRS's actions were not arbitrary and capricious.

F. Additions to the base amount

Rum argues that the imposition of interest and late fees should be voided because the IRS did not provide sufficient explanation as why he was assessed the maximum penalty.  Rum again relies on the same alleged flaws in the IRS's

27

factfinding process.  For the reasons stated above, Rum's arguments in this regard are wholly without merit, and are accordingly rejected.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.