# United States Court of Appeals
## For the First Circuit

No. 21-1009

UNITED STATES OF AMERICA,

Appellee,

v.

MONICA TOTH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Lipez, Circuit Judges.

Jeffrey P. Wiesner, with whom Jennifer McKinnon and Wiesner McKinnon LLP were on brief, for appellant.
Jennifer M. Rubin, Tax Division, Department of Justice, with whom David A. Hubbert, Acting Assistant Attorney General, Francesca Ugolini, Tax Division, Department of Justice, and Bruce R. Ellisen, Tax Division, Department of Justice, were on brief, for appellee.

April 29, 2022

BARRON, **Chief Judge**. In 2013, the U.S. Internal Revenue Service ("IRS") ordered the imposition of a penalty of over $2 million against Monica Toth for willfully failing to report her Swiss bank account in violation of the Bank Secrecy Act ("Act"). See 31 U.S.C. § 5314(a). Toth contested the penalty and refused to pay it. The government filed this suit in the U.S. District Court for the District of Massachusetts to obtain a judgment against Toth for the full amount of the penalty and then moved for summary judgment against Toth. The District Court ruled for the government on that motion, and Toth now appeals. We affirm.

## I.

Congress passed the Act in 1970 to curb the use of foreign bank accounts to evade taxes. See Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 28-30 (1974). The Act requires U.S. residents and citizens to file reports and keep records of certain relationships with foreign financial agencies. 31 U.S.C. § 5314(a).

U.S. Department of Treasury ("Treasury") regulations promulgated to implement the Act require an individual to file a Report of Foreign Bank and Financial Accounts ("FBAR") with the IRS for each calendar year that individual has more than $10,000 in a foreign bank account. 31 C.F.R. §§ 1010.350(a), 1010.306(c). If an individual fails to file an FBAR, the Act authorizes the IRS to impose a civil penalty of up to $10,000 for each violation.

31 U.S.C. § 5321(a)(5)(B). If an individual "willfully" fails to file an FBAR, the permissible maximum penalty that the statute authorizes increases to the greater of either $100,000 or 50 percent of the value in the account at the time of the violation. Id. § 5321(a)(5)(C)-(D).

Toth is a U.S. citizen who, since 1999, has had a foreign bank account with the Union Bank of Switzerland ("UBS"). Toth was subject to the Act's special reporting requirements for that account for at least the years 2005-2009, as in each of those years the account had at least $10,000 in it.

Toth first filed an FBAR disclosing her Swiss UBS account to the IRS in 2010. The next year, the IRS audited Toth. The audit revealed that Toth had failed to comply with the Act's reporting requirements prior to 2010, and the IRS filed the delinquent FBAR forms on her behalf for the relevant period (2005-2009).[1] At the end of the investigation, the IRS concluded that Toth's failure to file an FBAR had been willful for the 2007 calendar year. The IRS assessed a civil penalty against Toth, in consequence of her failure to file the requisite form, of $2,173,703, which, being half the value of her Swiss UBS account

---

[1] Toth contends that she attempted to file the necessary FBARs for this period in 2010 prior the audit. The forms, however, were sent to the wrong agency such that the IRS never had a record of them prior the IRS audit.

at the time of the violation, was the maximum allowable penalty set forth in the Act, see id. § 5321(a)(5)(C)-(D).[2]

Toth did not pay this penalty. The government then filed a civil suit against Toth in the District of Massachusetts on September 16, 2015, for a judgment imposing the full penalty that the IRS had assessed against her, as well as interest and late fees. Two different process servers attempted unsuccessfully to serve Toth personally. The government completed service by leaving a copy of the complaint at her residence on January 11, 2016, as permitted by Massachusetts Rule of Civil Procedure 4(d)(1) and Federal Rule of Civil Procedure ("Rule") 4(e)(1).[3]

A couple of weeks later, on February 5, 2016, the government moved for a default judgment against Toth on the ground that she had failed timely to answer the complaint.[4] The District Court granted the government's motion and issued a notice of default on February 9, 2016.

Shortly thereafter, Toth began to respond to the government's filings. She opposed the government's motion for

---

[2] The IRS also found, as part of that audit, that Toth had an outstanding tax liability and assessed against her a tax penalty for tax fraud.

[3] Another copy of the complaint was sent to Toth via certified mail on January 14, 2016.

[4] Toth was required to answer the complaint by February 1, 2016.

default judgment on April 28, 2016, and the following day the District Court held a hearing to discuss Toth's opposition to the government's already granted motion.

At that hearing, the District Court made clear that it was willing to reconsider the default but only if Toth either "g[o]t a lawyer or . . . start[ed] showing up in court to defend it." And, when Toth explained that she had not responded to the government's complaint because she "didn't know what it was" and that the law is "a world that . . .[she] d[oes]n't know about," the District Court strongly encouraged Toth to hire a lawyer, worked with the government to provide Toth with a non-compulsory list of lawyers she could hire, and granted Toth a 30-day continuance to retain counsel. Following the hearing, Toth moved to set aside the default judgment, but she did not hire a lawyer.

The District Court granted Toth's motion to set aside the default judgment on August 17, 2016. The District Court ruled that "this action should proceed on the merits" due to "the circumstances, which include a pro se plaintiff, a potential judgment of over $2 million and a dispute about service and actual notice of the case."

A little less than two months later, on October 13, 2016, Toth moved to dismiss the complaint under Rules 12(b)(4) and 12(b)(5) for untimely service of process, Rule 12(b)(2) for lack of personal jurisdiction, and Rule 12(b)(6) for failure to

state a claim. The District Court denied Toth's motion on all three grounds. United States v. Toth (Toth I), No. 15-CV-13367, 2017 WL 1703936, at *1 (D. Mass. May 2, 2017).

Toth filed her answer to the complaint after the District Court denied Toth's motion to dismiss. The case then proceeded to discovery.

At a scheduling conference to set deadlines for discovery, the District Court noted that Toth had failed to confer with the government's counsel as required by Rule 26(f). In response to Toth's expression of confusion as to what initial disclosures were, the District Court once again urged Toth to hire a lawyer.

By January 2018, Toth had missed two deadlines for responding to discovery requests and amending her initial disclosures set by the District Court. By that time, the government also had both moved to compel discovery twice and sought sanctions pursuant to Rule 37. The District Court ordered Toth to comply with the government's discovery requests and, as a sanction for having failed to have done so previously, forbade her from raising any non-privilege-based objections in her responses.

The government then again moved for sanctions against Toth on March 9, 2018, on the ground that, as of February 9th, Toth had failed to respond to the government's discovery requests.

The District Court refrained from ruling on the motion until it heard from the parties at a hearing scheduled for March 12th.

At that hearing, Toth provided the government with her amended initial disclosures as well as her responses to the government's discovery requests. The government in July nonetheless moved once more for sanctions against Toth on the ground that her responses were inadequate and noncompliant with the District Court's prior order imposing sanctions.

Toth did not oppose the government's motion, and the District Court ordered Toth to "show cause as to why these sanctions should not be imposed." The District Court noted "the gravity of the proposed sanctions," which included a finding of fact necessary for the government to impose the more than $2 million penalty against Toth -- namely, that Toth had violated the Act's reporting requirements willfully in 2007. See 31 U.S.C. § 5321(a)(5)(C).

Toth then filed four responses on September 10, 2018, September 14, 2018, September 25, 2018, and October 12, 2018. One of the responses disputed the government's characterization of her conduct during discovery. The three other responses disputed that she had willfully violated the Act.

On October 15, 2018, the District Court granted the government's motion for sanctions under Rule 37. United States v. Toth (Toth II), No. 15-CV-13367, 2018 WL 4963172, at *5 (D. Mass.

- 7 -

Oct. 15, 2018). The District Court ordered as the sanction that several facts be "taken as established," including that Toth violated the Act willfully. Id. at *5-6. The District Court recognized that the order imposed a "strong sanction[]," id. at *5, but explained that it was necessary due to Toth's "severe, repeated, and deliberate" "violations of the [District] Court's discovery orders" that amounted to "a pattern of stonewalling," id. at *4.

Discovery continued, and Toth -- after having then hired a lawyer -- produced documents that she had not previously disclosed. Toth moved to vacate the sanctions order on March 15, 2019. The District Court refused to do so. United States v. Toth (Toth III), No. 15-CV-13367, 2019 WL 7039627, at *1, *2 (D. Mass. Dec. 20, 2019).

The government moved for summary judgment, which the District Court granted on September 16, 2020. United States v. Toth (Toth IV), No. 15-CV-13367, 2020 WL 5549111 (D. Mass. Sept. 16, 2020). The District Court in its opinion so ruling reaffirmed its prior determination that Toth's violation of the Act had been willful. Id. at *5-*6; see also 31 U.S.C. § 5321(a)(5).

The District Court then turned to the defenses that Toth had raised in response to the motion for summary judgment with respect to the size of the penalty that the IRS sought to impose through the suit. These defenses were based on a Treasury

- 8 -

regulation and the U.S. Constitution's Excessive Fines and Due Process Clauses. Id. at *6-9. The District Court rejected each contention, and, having found as a matter of law that Toth had willfully failed to report her Swiss UBS account in 2007 and that the IRS did not err in assessing a penalty equal to the statutory maximum in this case, entered a judgment against Toth for $2,173,703.00 for Toth's willful failure to timely file an FBAR for the 2007 calendar year, $826,469.56 in late fees, and $137,925.92 in interest. Id. at *9. Toth filed this timely appeal.

## II.

We first consider Toth's challenge to the District Court's denial of her motion to dismiss the government's suit for lack of personal jurisdiction based on Rules 12(b)(4) and 12(b)(5). See Precision Etchings & Findings, Inc. v. LGP Gem, Ltd., 953 F.2d 21, 23 (1st Cir. 1992). We conclude that the challenge is without merit.

The government filed the complaint in this case on September 16, 2015. Rule 4(m) required at that time that a defendant be served with a summons within 120 days of the filing of the complaint. A new version of Rule 4(m) took effect, however, on December 1, 2015, which was before the government had completed service on Toth. That new version shortens the time for completing service from what it had been -- 120 days -- to 90 days. Proposed

Amendments to the Federal Rules of Civil Procedure, 305 F.R.D. 457, 463 (U.S. 2015). It also applies to "all proceedings in civil cases . . . commenced [after December 1, 2015] and, insofar as just and practicable, all proceedings then pending." Id. at 460.

The parties agree that the government served Toth 118 days after it filed its complaint. They thus agree that the government served her with process within the 120-day deadline set by the old version of Rule 4(m) but after the 90-day deadline set by the new version. For that reason, they also agree that the service was effective only if it would not be "just and practicable" to apply the new version of Rule 4(m) to Toth's case, such that the old version of the rule (with its longer, 120-day deadline) applies.

The parties agree that our review is de novo. See United States v. Mojica-Rivera, 435 F.3d 28, 31-32 (1st Cir. 2006). Assuming that is the case, we discern no error by the District Court, even under that standard of review.

The District Court made no explicit finding as to whether it would be "just and practicable" to apply the 90-day deadline (instead of the 120-day deadline) to this case. But, the District Court did find that Toth "knew [the government's process server] was attempting to serve her with legal process and . . . made a deliberate effort to avoid service." Toth II, 2018 WL 4963172

at *1;[5] cf. Ruiz Varela v. Sanchez Velez, 814 F.2d 821, 823 (1st Cir. 1987) (holding, in a case concerning Rule 4(m), that "[e]vasion of service by a putative defendant constitutes good cause" for extending the deadline for completing service). Indeed, the record supportably shows that Toth did so before the 90-day period itself had run. And, the government had made this point in its opposition to Toth's motion to dismiss, in which she made the same argument that she makes to us regarding the "just and practicable" standard.

Thus, the record leads us to conclude that the District Court premised its decision not to apply the 90-day deadline on the implicit determination that it would not be "just and practicable" to apply that deadline in this case because doing so would reward deliberate attempts to evade earlier service. Cf. United States v. Rodriguez, 14 F.3d 45 (1st Cir. 1993) (unpublished table decision) (affirming the district court's "implicit finding that [the] appellant's son [in that case] was 'residing' in her house for the purposes of" determining whether service of process

---

[5] Toth takes issue with certain statements the District Court made in a hearing regarding her evasion of service of process. But, she does not challenge on appeal the District Court's finding of fact that she evaded service of process as premised on these misstatements. Toth instead relies on these misstatements by the District Court regarding the government's attempts to serve her to contend that the government was affirmatively misleading the District Court in its motion requesting sanctions. We address that contention when we consider Toth's challenge to the District Court's order imposing sanctions against her.

- 11 -

satisfied Rule 4(d)'s requirements).  And, we see no basis for concluding that the District Court erred in making that determination.  See Hinton v. Va. Union Univ., 185 F. Supp. 3d 807, 843 (E.D. Va. 2016) ("As a general matter, . . . it is unjust to expect parties to abide by deadline-setting rules that were not in effect when the clock began ticking on a particular activity."); Freeman v. United States, 166 F. Supp. 3d 215, 218 (D. Conn. 2016) (applying the 120-day version of Rule 4(m) rather than the 90-day version); Vela v. City of Austin, No. 1-15-CV-1015, 2016 WL 1583676, at *3 (W.D. Tex. Apr. 19, 2016) (same); Cankat v. Cafe Iguana, Inc., No. 15-CV-5219, 2016 WL 1383490, at *1 n.1 (E.D.N.Y. Apr. 7, 2016) (same).  Indeed, we note, that as of December 1, 2015, there would have only been 14 days left on the clock for the government to complete service under the new version of that rule. Cf. Mojica-Rivera, 435 F.3d at 33 (considering the amount of time the party would have to file the motion if an amendment to the Federal Rules of Civil Procedure that shortened the window in which a party could file a motion was operative to determine whether it was "just and practicable" to implement that new deadline).

## III.

Toth's next challenge is to the grant of summary judgment against her and depends on her contention that the District Court's order sanctioning her under Rule 37(a)(2)(A) for discovery

violations was unwarranted. That order required "the following facts to be taken as established:

> 1. Defendant had legal control over, and the legal authority to direct the disposition of the funds in, the Account (and any sub-accounts), by investing the funds, withdrawing the funds, and/or transferring the funds to third-parties, between the date the Account was opened and at least December 31, 2008.

> 2. Should the United States establish that Defendant is liable for the penalty alleged in the complaint, for the purposes of calculating the amount of such penalty, the Account (and any sub-accounts) contained $4,347,407 as of the penalty-calculation date.

> 3. Defendant had a legal obligation to timely file an FBAR regarding the Account in each calendar year that the Account was open, including with regard to calendar year 2007.

> 4. Defendant willfully failed to file an FBAR regarding the Account with respect to calendar year 2007.

Toth II, 2018 WL 4963172 at *5-6.[6]

In entering summary judgment against Toth, the District Court relied on the facts -- including the fact that Toth "willfully failed to file an FBAR regarding the [Swiss UBS] account

---

[6] Toth also appealed the District Court's decision to deny her motion to vacate sanctions, which the District Court treated as a motion to reconsider. Toth, however, makes no distinct arguments challenging that decision by the District Court, and so we find any arguments to that effect waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988))).

- 13 -

with respect to calendar year 2007" -- that the sanctions order required to be taken as having been established.  Thus, the summary judgment ruling against her cannot stand if the sanctions order cannot.  But, as we will explain, we do not agree with Toth that the District Court abused its discretion in imposing the sanction -- severe though it was.

**A.**

Toth focuses in challenging the sanctions order on the District Court's decision to require that it be taken as an established fact that she "willfully failed to file an FBAR" for the 2007 calendar year.  She argues that this requirement was a particularly harsh sanction because, she contends, it "was tantamount to a default judgment," in that it precluded her from denying that she willfully failed to file an FBAR for the 2007 calendar year.  She then argues that the sanction, given that feature of it, was "extreme [and] unwarranted" because her conduct was far less "severe, repeated and deliberate" than the District Court found.

We review the District Court's "choice of sanction" under Rule 37 "for abuse of discretion."  AngioDynamics, Inc. v. Biolitec AG, 780 F.3d 429, 435 (1st Cir. 2015).  We consider both the substantive and the procedural factors that caused the District Court to impose the sanction.  Vallejo v. Santini-Padilla, 607 F.3d 1, 8 (1st Cir. 2010).  Substantive factors can include "the

severity of the violation, the legitimacy of the party's excuse, repetition of violations, the deliberateness . . . of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions." Robson v. Hallenbeck, 81 F.3d 1, 2 (1st Cir. 1996). Procedural ones can include "whether the offending party was given sufficient notice and opportunity to explain its noncompliance or argue for a lesser penalty." Malloy v. WM Specialty Mortg., 512 F.3d 23, 26 (1st Cir. 2008) (per curium). We see no abuse of discretion.

**B.**

The District Court based the sanction on the finding that Toth's "persistent violations of the Court's discovery orders" were "severe, repeated, and deliberate." Toth II, 2018 WL 4963172 at *4. The District Court acknowledged that Toth was proceeding pro se but explained that it "ha[d] been very accommodating to [Toth], affording her numerous extensions, ample notice, and many opportunities to explain herself." Id. The District Court emphasized that it had "attempted warnings and lesser sanctions to no avail." Id. at *5. The District Court then concluded that, in light of Toth's "pattern of stonewalling this litigation, including not meeting her discovery obligations despite numerous chances to do so," id. at *4, it saw "no effective option[] other than" to "tak[e] as established the four facts identified," id. at *5.

The record supportably shows that Toth failed from the outset to respond to the government's discovery requests and repeatedly missed deadlines for doing so set by the District Court.[7] Hooper-Haas v. Ziegler Holdings, LLC, 690 F.3d 34, 37 (1st Cir. 2012) ("We have said . . . that a party who flouts a court order does so at its own peril."). Specifically, Toth did not respond to the government's discovery requests until March 12, 2018 -- just nine days before discovery overall was scheduled to end and three months after the District Court had ordered Toth to respond to the government's discovery requests. Moreover, Toth did not amend her initial disclosures to conform with the Federal Rules until March 12, 2018, even though the District Court set October 6, 2017, as the deadline by which Toth was required to serve the government with her initial disclosures and had ordered Toth to amend her initial disclosures one month later.[8] Toth II, 2018 WL 4963172, at *3-4.

---

[7] For example, Toth failed to respond to any of the government's emails and other efforts to communicate with her to satisfy its obligation to confer prior to the scheduling conference. See Fed. R. Civ. Proc. 26(f)(1).

[8] On appeal, Toth tries to explain away her failure to timely respond to the government's discovery requests by suggesting that, as a pro se litigant, she was "overwhelmed with 1,200 pages of documents produced by the government." But, she does not explain why she needed to examine the government's documents before producing her own or why she did not seek an extension of time from the District Court to do so.

The record also supportably shows that the District Court repeatedly gave Toth second chances. For example, the District Court extended the deadline by which she was ordered to provide discovery and even cautioned the government "to remember that [Toth] currently represents herself and that her efforts will be held to a less demanding standard."

Moreover, the record shows that the District Court repeatedly warned Toth that she could face sanctions if she continued to fail to meet the court's deadlines, and that the District Court did not act on those warnings until three months had passed in which Toth had failed to amend her initial disclosures or respond to the government's discovery requests. On January 19, 2017, for example, the District Court imposed its first set of sanctions against Toth, "prohibiting her from withholding documents or information based on non-privilege objections." Toth II, 2018 WL 4963172, at *4. Toth was also warned that "[i]f [she] fail[ed] to comply," the District Court "may enter strong sanctions against her, including, but not limited to, . . . accepting certain facts as established, including that [she] acted 'willfully' when she failed to file an FBAR" and "entering a default against [her]."

Nevertheless, the record shows, Toth continued to fail to meet the District Court's deadlines. It further shows that when she did eventually serve her initial discovery responses on

- 17 -

March 12, 2017, her production consisted of just three single-page documents -- a copy of her college transcript, a copy of an envelope mailed to her by the District Court, and a Notice of Electronic Filing generated in this case -- and were replete with non-privilege-based objections in direct violation of the District Court's earlier sanction against her.[9]

Thus, we cannot say that the District Court was mistaken in its characterization of Toth's discovery violations as "persistent." Toth II, 2018 WL 4963172 at *4. Nor can we say

---

[9] On appeal, Toth disputes the District Court's characterization of her initial response to the government's discovery requests as "facially deficient." She points out that in total, "her responses comprised 28 single-spaced pages and included a one-and-a-half-page table of contents with a key to identify the documents referenced in her responses."

But, the District Court's conclusion that she withheld documents and produced a facially deficient response was premised primarily on the fact that "[h]er document production consisted of just three single-page documents, her responses to the [g]overnment's requests for production and interrogatories disregarded the [District] Court's sanction precluding [Toth] from withholding documents based on non-privilege objections, and her amended initial disclosures failed to comply with Rule 26." Toth II, 2018 WL 4963172, at *8.

Toth herself does not dispute the District Court's finding that her amended initial disclosures were non-compliant. Further, she admits that her interrogatories contained objections. And, finally, she does not dispute that her document production consisted of just three single-page documents; rather she seeks to excuse this by insisting that she did not withhold documents because "the government's document requests sought documents that had been either destroyed or lost over the years." (quotation omitted). But, after the "willfulness" sanction was imposed, Toth produced documents that had previously not been disclosed.

- 18 -

that the District Court abused its discretion in selecting the sanction it chose. Hooper-Haas, 690 F.3d at 37 ("A court faced with a disobedient litigant has wide latitude to choose from among an armamentarium of available sanctions."). The record shows that the discovery violations continued despite the District Court's imposition of lesser sanctions against Toth and warnings that if Toth continued to fail to comply with its discovery orders, she could be sanctioned severely, including by requiring that it be taken as established that she willfully failed to file her 2007 FBAR. See Remexcel Managerial Consultants, Inc. v. Arlequin, 583 F.3d 45, 51 (1st Cir. 2009) (noting that a severe discovery sanction "provides a useful remedy when a litigant is confronted by an obstructionist adversary and plays a constructive role in maintaining the orderly and efficient administration of justice." (quoting KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 13 (1st Cir. 2003))).

The sanction did take one of Toth's primary defenses off the table -- that she did not willfully violate the Act. But, she still had her other arguments, which she advances on appeal, including her regulatory and constitutional challenges. Thus, we agree with the District Court that the sanction at issue does not rise to the level of a default judgment. Toth II, 2018 WL 4963172, at *5; cf. Chilcutt v. United States, 4 F.3d 1313, 1320 (5th Cir. 1993) (finding that a sanction "was a far cry from a default

- 19 -

judgment" when the defendant was still able to present the affirmative defense of comparative negligence).

Moreover, the District Court gave Toth an opportunity to explain why this sanction was inappropriate. In fact, the District Court gave Toth an extended deadline to do so after Toth initially failed to timely respond to the government's motion seeking the imposition of the sanctions at issue here.

For these reasons, we reject Toth's contention that the District Court abused its discretion when it ordered that it was established for the purposes of this litigation that Toth's failure to file an FBAR in 2007 was willful. And, in consequence, we conclude, reviewing de novo, that there is "no genuine issue as to any material fact" with respect to whether Toth willfully failed to file an FBAR for the 2007 calendar year and affirm the District Court's grant of summary judgment on that issue. Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018) (quoting McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017)).

**IV.**

Toth also challenges the District Court's grant of summary judgment to the government with respect to the amount of the penalty that was imposed against her. Toth first points to a Treasury regulation that she contends precludes a penalty of that amount from having been imposed. Finding no merit to that

contention, we then also address her constitutionally based challenges to the amount of the penalty that was imposed.

## A.

Toth contends that, even though the more than $2 million penalty that the IRS assessed against her for her willful failure to file an FBAR for the year 2007 is permitted by statute, see 31 U.S.C. § 5321(a)(5)(C)(i)(II), (a)(5)(D)(ii), the penalty is still unauthorized. That is so, she contends, because the amount of the penalty exceeds the amount that the IRS may impose as a penalty under a regulation that the Treasury promulgated in 1987.

The regulation in question is 31 C.F.R. § 1010.820(g)(2) (2012), and Toth is right that it states that the maximum penalty that may be imposed for a willful failure to file in FBAR is $100,000. The question, though, is whether that regulation remains operative in the face of the statutory changes regarding the maximum penalty that were made after the regulation's issuance.

Toth contends that the 1987 regulation does remain operative and that it therefore places a ceiling on the penalty that may be imposed that is much lower than the statutory maximum that Congress set by statute after the regulation was promulgated. For that reason, she contends, the penalty at issue is unauthorized because an agency is required to follow its own regulations, see Accardi v. Shaughnessy, 347 U.S. 260, 267 (1954).

We do not agree. Rather, reviewing de novo, see Rideout v. Gardner, 838 F.3d 65, 71 (1st Cir. 2016), we conclude, like every other circuit to have considered this issue, see United States v. Kahn, 5 F.4th 167, 175 (2d Cir. 2021); United States v. Horowitz, 978 F.3d 80, 90-91 (4th Cir. 2020); United States v. Rum, 995 F.3d 882, 892 (11th Cir. 2021); Norman v. United States, 942 F.3d 1111, 1117 (Fed. Cir. 2019), that the regulation in question does not limit the IRS's ability to impose the statutory maximum penalty against Toth because the statutory amendments that increased the maximum amount for a civil penalty for a willful failure to file an FBAR from the $100,000 amount to the present one superseded the regulation.

At the time that the regulation was promulgated, in 1987, the maximum penalty under the statute for a willful failure to file an FBAR was $100,000. 31 U.S.C. § 5321(a)(5) (1987). That amount, of course, is the precise amount that the 1987 regulation at issue itself identified as the maximum. 31 C.F.R. § 1010.820(g)(2) (1987); see also Rum, 995 F.3d at 892 (noting that the regulation "mirrored the language of the statute at that time"); United States v. Garrity, No. 3:15-cv-243, 2019 WL 1004584, *1-2 (D. Conn. Feb. 28, 2019) (same).

In addition, the regulation was promulgated pursuant to a grant of statutory authority that did not -- at least in any clear way -- confer the power on the Treasury to establish a

ceiling on the maximum penalty that would be lower than the maximum penalty allowed by statute. See also Kahn, 5 F.4th at 175-76 (finding that "[n]othing in [the] language [of § 5321] authorizes the Secretary to promulgate a rule that would nullify a statutory provision that was deemed necessary by Congress"); Norman, 942 F.3d at 1117-18 (concluding the same). The regulation was promulgated instead pursuant to 31 U.S.C. § 5314(b)(5), which is merely a general grant of authority that provides that Treasury "may prescribe[]" regulations "necessary to carry out" the Act's reporting requirements for foreign accounts.

Indeed, there is no statutory provision that expressly confers on the Treasury the authority to impose a maximum penalty by regulation that is lower than the one set by statute. By contrast, there is a provision -- § 5314(b)(3) -- that expressly confers the authority on Treasury to set by regulation the maximum size of the transactions that must be reported under the Act. 31 U.S.C. § 5314(b)(3) (permitting the Treasury to set through regulation "the magnitude of transactions subject to a requirement or a regulation under" the Act); see also Garrity, 2019 WL 1004584, at *3 (noting that "where Congress intended in the [Act] to rely on [Treasury] first to flesh out the clear statutory scheme by regulation, it made that intention clear" and did not do so with respect to the size of the maximum civil penalty under § 5321(a)(5)(C)-(D)).

- 23 -

Finally, and as we have noted, the regulation was promulgated as an interpretive rule. Compare Amendments to Implementing Regulations; the Bank Secrecy Act, 51 Fed. Reg. 30233, 30236 (proposed Aug. 25, 1986) (proposing § 103.47(a)-(b), which caps the maximum penalty for a willful violation of § 5321(a)(5) by a financial institution to $10,000), with Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. 11436, 11446 (Apr. 8, 1987) (containing § 103.47(g)(2), which states that "for any willful violation committed after October 27, 1986" -- the date the Act was amended -- "the Secretary [of the Treasury] may assess upon any person," "in the case of a violation . . . involving a failure to report the existence of an account" "a civil penalty not to exceed the greater of the amount (not to exceed $100,000) equal to the balance in the account at the time of the violation or $25,000"); see also Kahn, 5 F.4th at 176-77 (describing the history of the 1987 rule). As such, it is properly understood to have been clarifying rather than substantive, which points against the notion that it purported to set a ceiling on the amount of the penalty different from the one that Congress had set. See La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992) ("[A]n interpretive rule is merely a clarification or explanation of an existing statute or rule and . . . creates no new law and has no effect beyond the

statute." (quotation omitted)); Hoctor v. U.S. Dep't of Agric., 82 F.3d 165, 169 (7th Cir. 1996).

In sum, neither the amount of the maximum penalty identified in the regulation, nor the statute authorizing the promulgation of the regulation, nor the means of its promulgation suggests that the Treasury intended the regulation to set a ceiling on the penalty that would apply even if the statute that set the maximum penalty at the time of the regulation's issuance was amended to raise it. Rather, the text of the regulation, the statute authorizing its promulgation, and the means of its promulgation each accords with an understanding that the Treasury intended the regulation merely to parrot the maximum amount for the penalty that Congress had set at the time that the regulation was promulgated. See also Kahn, 5 F.4th at 177 (characterizing the 1987 regulation as a "parroting regulation"); cf. United States v. Vogel Fertilizer Co., 455 U.S. 16, 26 (1982) (noting that the Supreme Court "has firmly rejected the suggestion that a regulation is to be sustained simply because it is not 'technically inconsistent' with the statutory language, when that regulation is fundamentally at odds with the manifest congressional design" (quoting United States v. Cartwright, 411 U.S. 546, 557 (1973))); Norman, 942 F.3d at 1118 ("It is well settled that subsequently enacted or amended statutes supersede prior inconsistent regulations.").

Moreover, the regulation's history supports the same conclusion. See also Kahn, 5 F.4th at 176-77 (reviewing the history of the 1987 regulation at issue here). In 1986, the Treasury initiated rulemaking to update the regulations implementing the Act. See Amendments to Implementing Regulations, 51 Fed. Reg. at 30233. Two years earlier, Congress had increased the civil penalties that applied to violations of recordkeeping requirements of the Act committed by financial institutions from $1,000 to $10,000, see Pub. L. 98-473 § 901(a), 98 Stat. 1837, 2135 (1984), and the proposed rules contained a regulation that reflected that change, see Amendments to Implementing Regulations, 51 Fed. Reg. at 30236.

But, before the Treasury published the final rule responding to those statutory developments, Congress amended § 5321(a)(5)'s maximum penalties once more. This time, though, the amendments enabled the Treasury to impose a civil penalty up to "the amount (not to exceed $100,000) equal to the balance in the account at the time of the violation" or $25,000 against any person who willfully failed to report the existence of a foreign account in violation of the Act. 31 U.S.C. § 5321(a)(5)(A)-(B) (1987). As a consequence, the Treasury adjusted the part of the rule regarding civil penalties to reflect that newly enabled $100,000 maximum civil penalty. In fact, the Treasury even explained in the final rules, published in 1987, that the "maximum

penalty" provided for in the rule "reflect[ed] [the] civil penalties applicable to . . . violations after October 1986 under the Anti-Drug Abuse Act of 1986." Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. at 11440 (emphasis added).

Thus, when Congress amended § 5321(a)(5)(C)-(D) to permit the IRS to impose a penalty in excess of $100,000, the 1987 regulation was superseded because the regulation -- as merely a regulation parroting a then-operative statutory maximum -- could have no effect once a new statutory maximum had been set. Cf. Gonzalez v. Oregon, 546 U.S. 243, 257 (2006) ("[T]he existence of a parroting regulation" that "merely . . . paraphrase[s] the statutory language" "does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute."). True, the regulation does not expressly state that it would have no effect in the event Congress set a new statutory maximum penalty. But, given the parroting nature of the rule, the regulation's silence on that score cannot fairly be read to reflect an intent by the Treasury to establish a $100,000 limit for all time no matter what new maximum Congress might impose by statute. Cf. United Dominion Indus., Inc. v. United States, 532 U.S. 822, 836 (2001) (refusing to construe a tax regulation that listed reporting requirements to exclude a reporting item not enumerated

when there was "no reason [for the agency] to [have] consider[ed]" it "at the time the regulation was drawn").

Toth nonetheless contends that there are reasons to construe the regulation's text to establish a still-controlling ceiling, notwithstanding the context and history just described. We are not persuaded.

Toth first points out that the Treasury did not withdraw or amend the regulation for twelve years after Congress increased the maximum penalty to exceed the cap set forth in the regulation -- a period that included the years she failed to report her Swiss UBS account as well as the IRS's audit of her. But, the Supreme Court explained when presented with a similar argument regarding a failure by the Treasury to amend a prior regulation that the failure "is more likely a reflection of [its] inattention than any affirmative intention on its part to say anything at all" -- especially in light of the Treasury's "relaxed approach to amending its regulations to track [legislative] changes." United Dominion Indus., 532 U.S. at 836; cf. Garrity, 2019 WL 1004584, at *3 ("[The Treasury] could not override Congress's clear directive to raise the maximum willful FBAR penalty by declining to act and relying on a regulation parroting an obsolete version of the statute."). And, we conclude that, in light of the reasons just recounted that support an understanding of the 1987 regulation to

have merely parroted the then-operative statutory maximum, this same logic applies equally here.

Toth next argues that the Treasury can be understood to have reaffirmed its commitment to the $100,000 ceiling based on other regulations that she purports implement the amended version of § 5321(a)(5). See 31 C.F.R. § 1010.821. She contends that these regulations, which left the regulation imposing the $100,000 maximum in place, show the Treasury's implicit approval of that maximum. But, the regulations Toth points to are merely congressionally mandated updates to tables listing statutory maximum penalties to account for inflation; they do not reflect any policy assessment about the merits of the new statutory maximum penalty under § 5321(a)(5). See 28 U.S.C. § 2461. Moreover, other regulations that are not statutorily mandated parrot the language of the new maximum civil penalty under § 5321(a)(5)(C)-(D), which indicates that the Treasury does not understand itself to be bound by the $100,000 regulatory "limit." See, e.g., Financial Crimes Enforcement Network; Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts, 75 Fed. Reg. 8844, 8854 (proposed Feb. 26, 2010) (codified at 31 C.F.R. § 1010).

Finally, Toth relies on two interpretive rules that she contends are applicable: (1) the rule of lenity, which is a "longstanding principle" of statutory construction that "demand[s] resolution of ambiguities in criminal statutes in favor of the

defendant," Hughey v. United States, 495 U.S. 411, 422 (1990); and (2) the canon that "[i]f the words [of a tax statute] are doubtful, the doubt must be resolved against the government and in favor of the taxpayer," United States v. Merriam, 263 U.S. 179, 188 (1923). But, even if we were to assume (contrary to the government's position) that these canons apply to a regulation implementing § 5321 -- which is itself neither a criminal measure nor one that imposes a tax -- the only question that Toth raises concerns whether a regulation that was expressly identified as "reflect[ing]" the terms of statute prior to its amendment is operative even when it would no longer "reflect[]" the statute's terms after the amendment. Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. at 11440. We are not aware of any authority, though, that suggests that the rule of lenity or the tax canon may be used to resolve a question of such supersession, especially as she has failed to show that (given the history we have recounted that underlies the regulation's promulgation) there is the kind of ambiguity as to that question that triggers such canons, see, e.g., United States v. Anzalone, 766 F.2d 676, 681 (1st Cir. 1985) (finding an ambiguity created by a regulation, the validity of which neither party questioned, that adopted a narrower construction of a statutory provision than the text of that provision itself would support); see also Kahn, 5 F.4th at 177 (finding that the rule of lenity does not apply to a

penalty under § 5321(a)(5)); <u>United States</u> v. <u>Bittner</u>, 19 F.4th 734, 748 (5th Cir. 2021) (finding that neither the rule of lenity nor the tax canon applies to a penalty under § 5321(a)(5)).  We thus reject Toth's contention that the Treasury regulation bars the IRS from imposing a penalty that exceeds $100,000 for her willful failure to file an FBAR in 2007.[10]

**B.**

We turn, then, to Toth's two federal constitutional grounds for overturning the grant of summary judgment against her, each of which take aim solely at the amount of the penalty. Reviewing de novo, <u>Rideout</u>, 838 F.3d at 71, we find neither ground for so ruling persuasive.

**1.**

Toth first contends that the more than $2 million penalty that she faces for willfully failing to file an FBAR for the 2007 calendar year violates the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution.  <u>See</u> U.S. Const. amend. VIII ("Excessive bail shall not be required, <u>nor excessive fines imposed</u>, nor cruel and unusual punishments inflicted." (emphasis

---

[10] We also note that to the extent Toth argues that the disagreement among federal courts as to whether the 1987 regulation is still operative creates an ambiguity that the rule of lenity can resolve, such an argument also fails.  <u>See</u> <u>Reno</u> v. <u>Koray</u>, 515 U.S. 50, 64–65 (1995) ("A statute is not 'ambiguous' for purposes of lenity merely because there is a division of judicial authority over its proper construction." (internal quotation marks omitted)).

added)).  Only monetary penalties that function as "punishment for some offense" are encompassed by the Clause.  United States v. Bajakajian, 524 U.S. 321, 327-28 (1998) (quoting Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265 (1989)).  Therefore, the penalty at issue here must qualify, at least in part, as "punishment" even to implicate the Excessive Fines Clause.

The Supreme Court explained in Austin v. United States, 509 U.S. 602 (1993), that there is no per se rule that the Excessive Fines Clause only applies to criminal proceedings.  Id. at 607.  What matters is whether that penalty, even if only a civil one, "is punishment."  Id. at 610.  The Court has also explained that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment."  Id. (quoting United States v. Halper, 490 U.S. 435, 448 (1989)).

The Court then applied that logic in Austin to hold that an in rem civil forfeiture under 21 U.S.C. § 881(a)(4) and (a)(7),[11] imposed following the successful prosecution of the owner of the

---

[11] Section 881(a)(1) and (a)(7) provide that "[t]he following shall be subject to forfeiture to the United States and no property right shall exist in them," including "controlled substances which have been manufactured, distributed, dispensed, or acquired" and "real property . . . , which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment."  21 U.S.C. § 881(a)(1), (a)(7).

property in question for violating state drug laws, was "punishment" and thus subject to the limitation imposed by the Eighth Amendment's Excessive Fines Clause. Id. at 606, 620. In reaching that conclusion, the Court emphasized that the civil forfeiture at issue could only be imposed following the conviction of a drug-trafficking crime, id. at 619-20, and relied on legislative history that suggested that Congress enacted the forfeiture provision because "traditional criminal sanctions of fine and imprisonment [were] inadequate to deter or punish the enormously profitable trade in dangerous drugs," id. at 620, rather than to redress "any damages sustained by society or to the cost of enforcing the law," id. at 621.

The Court applied that same logic in a subsequent case, United States v. Bajakajian, 524 U.S. 321 (1998), to find that a civil forfeiture under a different statutory scheme, 18 U.S.C. § 982(a)(1),[12] also was a "fine" under the Eighth Amendment. Bajakajian, 524 U.S. at 328. As the Court explained in Bajakajian, the in personam forfeiture was "imposed at the culmination of a

_____

[12] At the time Bajakajian was decided, § 982(a)(1) provided that "the court, in imposing sentence on a person convicted of an offense in violation of [31 U.S.C. § 5316, which required any individual who transports more than $10,000 out of the United States to report it or face criminal penalties,] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1) (1998).

- 33 -

criminal proceeding," id. at 328, in part, for, what the government in that case conceded, was the punitive purpose of deterrence, id. at 329 & n.4.[13]

But, unlike the civil forfeitures held to constitute "punishment" in both Austin and Bajakajian, this civil penalty is not tied to any criminal sanction. Rather, it was imposed following an administrative tax audit in which the IRS determined that Toth had failed to report a foreign bank account. Nor has the government conceded any punitive purpose.

Moreover, we conclude that, even if those points of distinction are not themselves dipositive, the civil penalty here is like the civil forfeitures in One Lot Emerald Cut Stones and One Ring v. United States, 409 U.S. 232 (1972), Stockwell v. United States, 80 U.S. 531 (1871), and the other early customs laws that Bajakajian itself recognized did not constitute punishment for purposes of the Excessive Fines Clause, 524 U.S. at 342-43 (explaining that the "early monetary forfeitures," such as the ones discussed Stockwell and One Lot Emerald Cut Stones, "were

---

[13] The government also asserted that it had "an overriding sovereign interest in controlling what property leaves and enters the country" and that seizure of money secretly transported out of the country in violation of 31 U.S.C. § 5316 would compensate the government for that informational loss. Id. But, given the government's concession that the forfeiture was at least in part punitive, the Court found the deterrent nature of the penalty "sufficient to bring the forfeiture within the purview of the Excessive Fines Clause." Id. at 329 n.4.

- 34 -

considered not as punishment for an offense, but rather as serving the remedial purpose of reimbursing the [g]overnment for the losses accruing from the evasion of customs duties").  And, too, it is like the civil tax penalties found not to be punishment for Double Jeopardy purposes in Helvering v. Mitchell, 303 U.S. 391, 398 (1938), and Excessive Fines purposes in McNichols v. C.I.R., 13 F.3d 432, 434-435 (1st Cir. 1993) (quoting Helvering, 303 U.S. at 401); see also Thomas v. C.I.R., 62 F.3d 97, 98 (4th Cir. 1995) ("[T]he Excessive Fines Clause is not implicated, since the addition to [the] tax[es] [owed] is not a punitive measure."); United States v. Alt, 83 F.3d 779, 784 (6th Cir. 1996) (same); Tyler v. Hennepin Cty., 26 F.4th 789, 794 (8th Cir. 2022); Little v. C.I.R., 106 F.3d 1445, 1455 (9th Cir. 1997) (same); Kitt v. United States, 277 F.3d 1330, 1337 (Fed. Cir. 2002) (same); cf. United States v. Dunkel, 182 F.3d 923 (7th Cir. 1999) (unpublished table decision).[14]

---

[14] Toth argues in her reply brief that we should not rely on Double Jeopardy cases in analyzing whether § 5321(a)(5) is "remedial" because Toth suggests that some statutes may be considered "remedial" for Double Jeopardy purposes yet remain subject to the Excessive Fines Clause.  But, she has not shown that the two Double Jeopardy cases on which we rely here -- One Emerald Lot Cut Stones and Helvering -- involved statutes that, though remedial for the former purpose, are not for the latter. See Zannino, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); see also Villoldo v. Castro Ruz, 821 F.3d 196, 206 n.5 (1st Cir. 2016) (noting that new arguments cannot be

We make that assessment because -- unlike the forfeiture at issue in Bajakajian, which was ordered notwithstanding that there "was no fraud on the United States, and [the subject of the forfeiture] caused no loss to the public fisc," id. at 329, 339 -- here there was such a fraud and loss. Indeed, Congress authorized the imposition of a penalty of this size for willfully failing to comply with the Act's reporting requirements to address the fact that "[i]t has been estimated that hundreds of millions in tax revenues [were] lost" due to the secret use of foreign financial accounts -- which Congress characterized as the "largest single tax loophole permitted by American law," H.R. Rep. No. 91-975, at 4397-98 (1970), and that it was very difficult for law enforcement to police the use of these accounts, causing costly investigations to stretch on for years, id. at 4397.[15] Cf. Bajakajian, 524 U.S. at 343 (explaining that the monetary penalty at issue in One Lot Emerald Cut Stones was remedial in part because

---

made for the first time in reply briefs). We note, too, that Bajakajian, in finding the statute there at issue was not "solely" remedial for Excessive Fines purposes, distinguished it from the statute at issue in One Emerald Lot Cut Stones. See Bajakajian, 524 U.S. at 342-43.

[15] Similarly, the Senate Report discussing the 2004 amendments to § 5321(a)(5) explains that the impetus for those amendments was that "the number of individuals involved in using offshore bank accounts to engage in abusive tax scams ha[d] grown significantly in recent years" -- underscoring the concern that the secret use of foreign accounts enables individuals to evade taxes. S. Rep. 108-192, at 108 (2003).

the penalty was proportioned on the value of the non-reported goods); One Lot Emerald Cut Stones, 409 U.S. at 237 (holding that the forfeiture of goods for a failure to pay import duties on them is a "reasonable form of liquidated damages," as the more expensive the illegally imported good, the more the government has likely missed out on revenue); Stockwell, 80 U.S. at 533, 546-47 (finding that a statutory scheme that permitted the government to impose on an individual who deals in illegally imported goods a penalty equal to double the value of those goods was "remedial" because "[t]he act of abstracting goods illegally imported, receiving, concealing, or buying them, interposes difficulties in the way of a government seizure, and impairs, therefore, the value of the government right" such that "[i]t is . . . hardly accurate to say that the only loss the government can sustain from concealing the goods liable to seizure is their single value").[16]

Of course, the government does have means for recouping tax losses from undisclosed foreign assets other than imposing a penalty for a failure to comply with a reporting requirement about

---

[16] For that reason, too, Toth's argument that the civil penalty assessed against her is a "fine" because, like in Austin, the penalty could be subject to "dramatic variations in the value" fails, Austin, 509 U.S. at 621. Like in One Lot Emerald Cut Stone, the tax loss to the government is likely to increase the higher the value in the account, see 409 U.S. at 237. Thus, the fact that the penalty under § 5321(a)(5)(C)(i) is keyed to the amount in the bank account at the time of the violation fails in and of itself to make it a "punishment."

the existence of those assets. But, the fact that Congress may tax a foreign account once it learns of it does not prevent a penalty assessed under § 5321(a)(5) from being remedial. In that regard, Helvering and McNichols make clear that a tax penalty for failing to file taxes can exceed the amount owed in taxes without thereby constituting punishment. See Helvering, 303 U.S. at 401 (finding that the government could require an individual who had failed to pay his taxes to both pay the amount owed in taxes that had not been paid as well as impose a 50 percent penalty for willfully failing to pay those taxes); McNichols, 13 F.3d at 434-36 (same); see also Landa v. United States, 153 Fed. Cl. 585, 599 (2021) ("Though the FBAR penalty is not an internal-revenue tax, the Court finds instructive cases involving tax penalties that address, as does the FBAR penalty, behavior related to financial accounts."). And, as Congress explained, governmental investigations into funds hidden abroad "are often delayed or totally frustrated," in part due to the "time consuming and ofttimes fruitless [nature of] foreign legal process." H.R. Rep. No. 91-975, at 4397 (1970). We add only that the frustration of governmental efforts to recoup what is owed from a foreign account is likely to be especially effective in the circumstance in which

this penalty may be imposed -- namely, when the holder of the undisclosed foreign account is willfully seeking to hide it.[17]

Nor are we persuaded by Toth's argument that the fact that § 5321(a)(5) provides for different maximum penalties depending on the willfulness of the violation necessarily reveals that a deterrent or retributive purpose underlies the provision that authorizes the maximum penalty to be imposed. Compare 31 U.S.C. § 5321(a)(5)(C)-(D) (permitting the imposition of a civil penalty not to exceed $100,000 or the value of the bank account at the time of the violation, whichever is greater, for willful violations), with id. § 5321(a)(5)(B)(i) (permitting the imposition of a civil penalty not to exceed $10,000 for non-willful violations). The "culpability of the owner" in the forfeiture scheme at issue in Austin did support the determination that it was a "fine" for Eighth Amendment purposes. 509 U.S. at 621-22. But, the petitioner's underlying failure to report income or pay taxes in McNichols was concededly willful, and there is no suggestion in our opinion that this fact was sufficient to make it a "fine" under the Excessive Fines Clause. 13 F.3d at 433-35; see

---

[17] Notably, 31 U.S.C. § 5322(a) and (b), which makes it a criminal offense to willfully commit the same reporting offense under the Act, uses the word "fine" to describe the monetary penalty that could be imposed if an individual is convicted under it, see One Lot Emerald Cut Stones, 409 U.S. at 236, while there is no such reference to a "fine" in the civil analog that is at issue.

also Helvering, 303 U.S. at 399-404 (concluding that a similar focus on culpability in a provision of the Tax Code that permitted the imposition of a 50 percent addition to a tax assessment if the tax evasion was found to be willful was not found by the Supreme Court to render an otherwise remedial penalty punitive). Toth develops no argument as to why we should depart from McNichols on this score.

We also do not see why the existence of a lower penalty for the same violation when it is not committed willfully in and of itself makes the higher penalty "punishment." After all, Congress could choose to permit the government to only recover a portion of its losses or investigatory costs and the scheme would be no less remedial. Moreover, the tax scheme at issue in McNichols provided for a lower 5 percent penalty for a negligent or intentional, non-fraudulent failure to pay certain taxes, and the gradient nature of that scheme did not prevent this circuit from concluding that the 50 percent penalty for tax fraud was remedial in nature. See McNichols, 13 F.3d at 433-35 (discussing the penalty assessed against McNichols for tax fraud); 26 C.F.R. § 301.6653-1 (providing for a 5 percent penalty for underpayment due to negligence or intentional disregard, without intent to defraud).

Thus, for all these reasons, we conclude that a civil penalty imposed under § 5321(a)(5)(C)-(D) is not a "fine" and as

such the Excessive Fines Clause of the Eighth Amendment does not apply to it.

## 2.

Toth bases her final federal constitutional ground for contending that the grant of summary judgment against her must be reversed due to the amount of the penalty on the Due Process Clause of the Fifth Amendment. But, in support of this contention, Toth cites in her opening brief only to BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), which is a case that involves a punitive penalty imposed by a jury. That choice of argument presents a problem for Toth because in Sony BMG Music Entertainment v. Tenenbaum, 719 F.3d 67 (1st Cir. 2013), we held that BMW does not apply to cases like this one that involve a penalty set by statute. Id. at 70-71. Moreover, even though the government contends in its brief to us that the Sony standard and not the BMW standard applies, Toth in her reply brief does not attempt to show that her Fifth Amendment rights were violated under the Sony framework. Rather, she contends only that Sony is distinguishable, such that BMW applies here, because a penalty imposed pursuant to § 5321 presents a "peculiar[] . . . circumstance" given that "the FBAR penalty statute conflicts with the applicable Treasury regulation concerning the amount of the FBAR penalty."

New arguments, however, may not be made in reply briefs. See Villoldo, 821 F.3d at 206 n.5. In addition, for reasons that

- 41 -

we have explained, the statute does not conflict with the regulation.  We thus conclude that Toth has waived any argument as to whether the penalty that the IRS assessed against her violates the Due Process Clause of the Fifth Amendment.  <u>See</u> <u>Zannino</u>, 895 F.2d at 17.

## V.

For these reasons, we **<u>affirm</u>** the judgment of the District Court.